PADNEY, Admr., et al., Appellants and Cross–Appellees,

v.

METROHEALTH MEDICAL CENTER et al., Appellees and Cross–Appellants.

[Cite as *Padney v. MetroHealth Med. Ctr.* (2001), 145 Ohio App.3d 759.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78264.

Decided Sept. 10, 2001.

760

*Linton & Hirshman, Tobias J. Hirshman* and *Mark W. Ruf,* for appellants.

*Reminger & Reminger, Lawrence A. Sutter, T. Leigh Amenson, James L. Malone* and *Christina Marshall,* for appellees.

KENNETH A. ROCCO, Presiding Judge.

This case is before the court on appeal from a decision by the common pleas court to grant a directed verdict in favor of defendant MetroHealth Medical Center at the close of plaintiffs' case in this tort action. Appellants argue:

"I. The trial court erred in directing a verdict in favor of MetroHealth Medical Center on plaintiffs' *Blankenship* claim since reasonable minds could find that the elements of an employer intentional tort claim had been met.

"II. The trial court erred in directing a verdict in favor of MetroHealth Medical Center on plaintiff's negligence claims since reasonable minds could find the elements of a negligent infliction of emotional distress claim had been met.

"III. The trial court erred in striking the expert opinion testimony of Dr. Nardell establishing that the conduct of MetroHealth Medical Center was negligent."

MetroHealth cross-appeals, arguing:

"The trial court erred by not sustaining defendant's motion for a directed verdict after opening statement on appellants' intentional tort and negligent infliction of emotional distress claims."

We find that the trial court erred by directing the verdict and therefore reverse and remand for further proceedings.

## FACTS AND PROCEDURE

The complaint in this case was originally filed on November 7, 1996, and was amended several times. The fifth and final amended complaint was filed June 22, 1998. It alleged that plaintiffs' decedent, Edward Padney, contracted multi-drug resistant tuberculosis while employed by defendant MetroHealth Medical Center as a diener, an assistant in performing autopsies. Plaintiffs, the representative of Padney's estate and Padney's wife and daughter, claimed that MetroHealth failed to employ adequate controls to prevent the transmission of tuberculosis to its employees, knowing that the conditions created by these failures constituted a dangerous instrumentality within its business and that it was substantially certain that an employee subjected to these conditions would be harmed. The first count of the complaint claimed that Edward Padney contracted tuberculosis as a result of MetroHealth's intentional wrongdoing. The second and third counts claimed that Padney's wife and daughter suffered the loss of his consortium and services. Count four claimed that MetroHealth negligently caused the wife and daughter to suffer emotional distress, mental anguish, anxiety, loss of enjoyment of life, and fear of physical peril because they have tested positive for tuberculosis, and count five claimed that Edward Padney suffered the loss of their consortium and services. Count six demanded punitive damages. Count seven asserted that the contractor, engineer, architect, and various John Doe parties allegedly responsible for designing, constructing, maintaining, or renovating the autopsy suites negligently performed their duties.

The claims against all named parties except MetroHealth were dismissed before trial. During trial, plaintiffs withdrew their claim for punitive damages.

The jury trial began on May 31, 2000. Plaintiffs presented the live testimony of seven MetroHealth employees as on cross: Thomas Rao, director of facilities management; Dr. Amir Khiyami, a pathologist and head of autopsy services at the time Padney was infected; John Carroll, vice president of facilities and institutional services; Paul McIntosh and Keith Allie, dieners in the pathology department; Dr. Richard Blinkhorn, Padney's treating physician and chairman of the infection-control committee at MetroHealth; and Joan Sorensen, administrative director of the pathology department. Plaintiffs also presented the videotaped testimony of pathologists Drs. Carlena Madelair and Josephine Ashmead. In addition, plaintiffs presented the testimony of tuberculosis expert Dr. Edward Nardell and economist John Burke, as well as the testimony of plaintiffs Theresa and Gina Padney. Finally, the jury heard the decedent's testimony, preserved on videotape.

The testimony showed that Edward Padney was employed as a diener in the autopsy department at MetroHealth. He contracted multi-drug resistant tuberculosis while assisting in an autopsy on September 25, 1992, on a cadaver infected

with that disease. This strain does not respond to the usual treatments for tuberculosis and therefore poses a high risk of mortality (fifty percent) for anyone with the active disease.

The patient who was autopsied had not been treated for the last two weeks of her life, which increased the contagiousness of her disease. In addition, she suffered from AIDS, which resulted in the dissemination of the tuberculosis throughout her body. Consequently, the danger of infection from her was higher than in a typical case of tuberculosis. This danger was publicized through publications of the Centers for Disease Control ("CDC"). The physicians who treated this patient ordered the autopsy and sought the consent of her family.

Padney's wife and daughter contracted multi-drug resistant tuberculosis from Padney. The tuberculosis remained latent in the wife and daughter to the date of trial. The risk that the latent disease would become active in them was ten percent over their lifetimes and approximately five percent as of the time of trial.

The tuberculosis became active in the decedent in April 1995. He suffered respiratory failure in September 1995 and was placed on a ventilator. While on the ventilator, he developed a clot in his right leg, which ultimately required amputation of the leg. He died March 28, 1998, after a violent coughing episode led him to cough up a substantial amount of blood. His treating physician described the progress of his disease as "unchecked pulmonary tuberculosis for three years and a considerable amount of suffering."

In 1990, the CDC implemented guidelines for preventing the transmission of tuberculosis in health-care settings. These guidelines recommended that autopsy rooms have ventilation that provides at least twelve total air changes per hour, as well as good distribution of air flow, negative pressure with respect to adjacent areas, and exhaust to outside the building. "P[ersonal] R[espirator]s should be worn by personnel performing procedures that may aerosolize infectious particles (e.g., sawing, irrigating)."

The ventilation system in the isolation room in the autopsy suite where the autopsy was performed was providing 18.5 air changes per hour when it went into use in 1970; however, on August 6, 1982, the room was functioning at six air changes per hour. It was not modified from that date until the date of the autopsy from which Padney contracted tuberculosis. Although there was testimony that the system was tested approximately annually, MetroHealth could not locate any other quantitative studies of the ventilation in the isolation room from before the date Padney was infected, but a 1986 memorandum from the plant engineering department "verified that the system [for the autopsy suite] is within the design parameters and meets applicable standards." The room had negative pressure as compared to adjacent areas. The system was vented to the outdoors. Personnel wore regular surgical masks while performing autopsies.

In addition to the ventilation system, there were also ultra-violet ("UV") lights. Plaintiffs' expert testified that these lights reduced the risk of infection, adding the equivalent of ten to twenty air changes per hour to that room.

Plaintiffs' expert testified that with six air changes per hour, the likelihood of infection from one hour of exposure to an infectious dose of tuberculosis was sixty to sixty-five percent. With the ultraviolet lights, this risk was reduced to approximately twenty-five to thirty percent. This risk could have been further reduced by the use of a personal respirator and would have been eliminated by a positive air pressure respirator.

At the close of the plaintiffs' case, MetroHealth moved for a directed verdict. MetroHealth argued that it was not substantially certain that Padney would contract tuberculosis, nor was he required to assist in the autopsy in which he contracted the disease. MetroHealth further asserted that plaintiffs' emotional distress claims were derivative of the employee's claim, so that if the hospital did nothing wrong with respect to the employee, then it did nothing wrong with relation to his wife and child. Alternatively, it argued that it owed no duty to the wife and child of an employee. The court granted MetroHealth's motion, making the following statement on the record:

"THE COURT: After a thorough and searching review of the evidence and testimony presented in this case by the plaintiffs and applying the elements of intentional tort as set forth in the law of the state of Ohio, the defendant's motion for directed verdict pursuant to Rule No. 50 overrules the [sic, rules of?] civil procedure and are granted."

## LAW AND ANALYSIS

Plaintiffs' first two assignments of error contend that the court erred by directing the verdict for MetroHealth on their claims for intentional tort and negligent infliction of emotional distress and their derivative claims for loss of consortium. A motion for directed verdict questions the legal sufficiency of the evidence and therefore constitutes a question of law, not of fact. *Glover v. Boehm Pressed Steel Co.* (1997), 122 Ohio App.3d 702, 702 N.E.2d 929. If, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [the court] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." Civ.R. 50(A).

We review this determination *de novo*.

Our review here was hampered by the trial court's failure to state the reasons for its actions on the record. The trial court did not comply with its

obligation under Civ.R. 50(E) to state in writing the basis for its decision. Although plaintiffs did not object before the trial court and therefore waived this error, the purpose of the rule is not only to provide an explanation to the losing party but also to provide guidance to the appellate court on review. Lacking such guidance, we have been forced to "reinvent" the legal analyses the trial court already should have performed. This is a waste of judicial resources.

## A. Intentional Tort

■ The complaint in this case asserts an intentional tort claim against MetroHealth. To succeed on this claim, plaintiffs must demonstrate, directly or through circumstantial evidence, that (1) MetroHealth knew of the existence of a "dangerous process, procedure, instrumentality or condition within its business operation"; (2) MetroHealth knew that harm to an employee would be substantially certain to occur if the employee were subjected to this danger by his employment; and (3) with this knowledge, MetroHealth required the employee to continue to perform the dangerous task. *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus. The risk of harm must be relatively high to reach the level of a substantial certainty: mere negligence or recklessness is not enough. *Id.* at paragraph two of the syllabus.

There was evidence in the record from which a jury could find that Metro-Health knew of the existence of a dangerous condition within its business. Among other things, there was evidence that MetroHealth was aware of the CDC standards for preventing the transmission of tuberculosis in a hospital setting at the time Padney was infected. Those standards indicate that "nosocomial transmission of tuberculosis has been associated with * * * procedures such as * * * autopsy" and include recommendations for preventative measures in autopsy rooms. There was evidence that MetroHealth's autopsy isolation room did not comply with the CDC standards, first because it had only half the recommended number of air changes per hour, and second because it did not include the use of personal respirators among its standard safety precautions. This evidence would permit a reasonable jury to conclude that MetroHealth knew of a dangerous condition in its business.

■ MetroHealth claims that it did not know that the conditions in the autopsy room were dangerous because there was no evidence that anyone had ever contracted tuberculosis in its autopsy rooms. "Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe." *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417, 429, 657 N.E.2d 356. Furthermore, there is evidence that Metro-Health was aware that the danger of transmission was magnified in this case

because the strain of tuberculosis involved was multi-drug resistant, the decedent was untreated, and she had AIDS, which resulted in the dispersal of the tuberculosis throughout the body. Thus, the fact that no other autopsies had resulted in the transmission of tuberculosis to a hospital employee is not determinative.

Second, there was evidence from which a reasonable jury could find that MetroHealth knew that harm to its employees was substantially certain to occur if they were subjected to this danger. According to plaintiffs' expert, the risk of contracting tuberculosis from a one-hour exposure to an infectious dose under the conditions in the isolation room at the time Padney was infected was twenty-five to thirty percent. The testimony does not show that this calculation accounts for the increased risk of infection attendant to the fact that the disease in this patient was untreated before her death and that the disease was dispersed throughout her body as a result of her infection with AIDS. If a person present during the autopsy contracted tuberculosis, there was a further five to ten percent chance that the disease would become active in them. If the disease became active, there was a fifty percent chance that multi-drug resistant tuberculosis would be fatal.

MetroHealth concludes from this that it was not substantially certain that Padney would contract a fatal disease from performing this particular autopsy; however, we are not assessing only the risk that Padney would die. Even latent tuberculosis constitutes an injury, particularly when that disease is drug-resistant. A reasonable jury could find that it was substantially certain that Padney would contract multi-drug resistant tuberculosis from performing an autopsy on a decedent who suffered from that disease, dispersed throughout her body, which had not been treated for two weeks before her death, under the conditions in the isolation autopsy room during this autopsy, which did not comply with the CDC standards.

■ MetroHealth invites us to quantify a "substantial certainty" and suggests that a seventy-five percent likelihood of injury is the appropriate standard. We reject such a numerical gauge. While statistical assessments may be helpful in determining whether harm is substantially certain to occur, they are not conclusive. Among other things, the determination whether harm is substantially certain to occur involves not only a consideration of the likelihood that harm will occur but also an assessment of the seriousness of the harm if the risk does come to pass. A "substantial certainty" that a condition will cause an injury which may result in death may differ from a "substantial certainty" of an injury which is not life-threatening. Consequently, we cannot attach decisive significance to statistical risk assessments.

A reasonable jury could find that MetroHealth knew that it was substantially certain that Padney would contract this disease. MetroHealth was aware of the CDC standards, which specifically stated that "[s]tandard surgical masks may not be effective in preventing the inhalation of droplet nuclei, because some are not designed to provide a tight face seal and to filter out particulates in the droplet nucleus size range (1–5 microns)," yet its safety regulations required the use only of standard surgical masks. It was also aware that the CDC standards required ventilation equal to twelve total air changes per hour, but this isolation room only had six air changes per hour. MetroHealth was aware that this patient was particularly infectious because of the dispersal of the disease throughout her body and the fact that it was untreated but ordered no special precautions to be taken in this case. Cf. *Brown v. Packaging Corp. of Am.* (Jan. 11, 2001), Cuyahoga App. No. 77709, unreported, 2001 WL 30429.

■ Finally, MetroHealth urges that Padney, as a supervisor, did not have to perform this autopsy but could have assigned it to another diener. That Padney could have placed another employee at risk does not negate the fact that MetroHealth requires employees to incur the risk. The job duties of a diener require him or her to assist in all autopsies, including those involving infectious diseases. One of the dieners testified that dieners were assigned to cases involving infectious diseases by rotation and that he routinely assisted in approximately four tuberculosis cases per year. Thus, there was evidence from which a jury could have found that MetroHealth required its dieners, including Padney, to assist in autopsies under these unsafe conditions. See *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 487, 696 N.E.2d 1044.

Accordingly, we find the trial court erred by granting a directed verdict to MetroHealth on plaintiffs' intentional tort claim, as well as on the loss of consortium claims associated with it.

### B. Negligent Infliction of Emotional Distress

■ Plaintiffs also argue that the trial court erred by directing the verdict on their claim for negligent infliction of emotional distress. The evidence demonstrated that both Theresa and Gina Padney have latent tuberculosis, which they acquired from the decedent. Neither has developed active tuberculosis, but both are at risk because they carry the latent disease. They seek recovery for their fear of developing active tuberculosis of the same type that killed the decedent.

■ MetroHealth argues that it owed no duty to Padney's family. First, MetroHealth claims that the risk of injury to Padney's family was not foreseeable because the injury to Padney himself was not foreseeable. As previously discussed, however, there was evidence from which a jury could conclude that the transmission of tuberculosis under the conditions in the isolation room during this

autopsy was not only foreseeable but substantially certain. It is foreseeable that a contagious disease acquired by an employee at work will be transmitted to persons with whom the employee has close contact, particularly family members who reside with him or her. Therefore, we find that MetroHealth owed a duty of care to the family members of employees whom MetroHealth placed at risk of acquiring tuberculosis by their working conditions. A reasonable jury could find that MetroHealth breached its duty of care to Padney's family by failing to take any action to prevent the transmission of tuberculosis to them or to warn them of the risk. See *Mussivand v. David* (1989), 45 Ohio St.3d 314, 544 N.E.2d 265.

 The disease in both plaintiffs is latent, but they are both at risk for developing active tuberculosis for the rest of their lives. Though the likelihood that they will develop active tuberculosis is now relatively small, five percent, it was as high as ten percent. There is a fifty-percent mortality rate if it does become active. This is a real danger, not a nonexistent peril. Cf. *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 652 N.E.2d 664. Because the emotional distress for which plaintiffs seek recovery is associated with a real physical peril to the plaintiffs themselves, the emotional injury need not be severe or debilitating to be compensable. Cf. *Binns v. Fredendall* (1987), 32 Ohio St.3d 244, 513 N.E.2d 278.

We find evidence in the record from which a reasonable jury could find that MetroHealth negligently inflicted emotional distress upon plaintiffs; therefore, the trial court erred by directing the verdict for MetroHealth on this claim and on the derivative claim for loss of consortium.

Our conclusion that the trial court erred by directing the verdict renders moot plaintiffs' claim that the court erred by striking part of the testimony of their expert witness.

## C. Cross–Appeal

MetroHealth's cross-appeal contends that the trial court should have directed the verdict in its favor after plaintiffs' opening statement. It claims that appellants conceded that they did not have proof of the "job requirement" element of their intentional tort claim because they admitted that Padney could have assigned the autopsy to another diener. MetroHealth also argues that appellants did not indicate that they had proof that their emotional injuries were "severe and debilitating." To the extent that MetroHealth seeks to defend the judgment on an alternate ground, see App.R. 3(C)(2),[1] we have already addressed

---

1. MetroHealth did not file a separate notice of cross-appeal, so we lack jurisdiction to consider its arguments on any other basis. App.R. 3(C).

and rejected these arguments in ruling on appellant's assignments of error; therefore, we overrule the sole assignment of error on cross-appeal.

We reverse and remand for a new trial.

*Judgment reversed*
*and cause remanded.*

FRANK D. CELEBREZZE, JR., J., concurs.

TERRENCE O'DONNELL, J., dissents.

TERRENCE O'DONNELL, Judge, dissenting.

I respectfully dissent.

The majority has based its opinion in part on evidence from 1982 that the isolation room of the autopsy suite functioned at six air changes per hour. This evidence, however, does not support the conclusion that the same rate of air exchange existed ten years later, in 1992, when Edward Padney assisted in the autopsy of Elba Ramos.

At trial, Padney's expert witness, Dr. Edward Nardell, an associate professor of medicine at the Harvard Medical School, testified based on six changes of air per hour, and the majority has cited, relied upon, and utilized his opinion regarding the likelihood of infection based on the assumption that the ventilation system functioned at that rate on September 25, 1992, when Padney participated in the autopsy of Elba Ramos.

However, the transcript contains evidence that Dr. Nardell had no idea what the actual air changes were in the autopsy isolation room on September 25, 1992, but that, based upon an August 6, 1982 office memorandum from Lawrence S. Toth to Maxine Hampson, he assumed that it was six; that memo, however, predated the Ramos autopsy by ten years.

The transcript of the trial of this matter reveals the following:

"Q. (by Mr. Sutton) And in 1970 when it went on line, it was tested at 18.5?

"A. (by Dr. Nardell) Yes.

"Q. Now, somewhere along the line, we get to 1992, right?

"A. Yes.

"Q. And you'll admit that you have no idea what the actual air changes were on September 25, 1992? You don't know.

"A. True.

"Q. And are you going to tell us that you think it was 6?

"A. Yes.

"Q. All right. And the reason that you say it was 6 is based solely upon that 1982 memo, right?

"A. Yes.

"Q. And that 1982 memo, that's a decade before this, would you agree with that?

"A. Yes."

In addition, the transcript reveals that Dr. Nardell admitted that a 1986 hospital memo indicated that the plant engineering department had investigated the ventilation system in the autopsy suite and verified the system to be within designed parameters of sixteen air changes per hour.

This, however, is not only a case about factual distinctions but also concerns application of the doctrine of intentional tort.

In *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, the court stated in the first paragraph of its syllabus:

"Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)"

More significant in this case, in my view, is the second paragraph of that syllabus, which states:

"To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by

the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph six of the syllabus, modified as set forth above and explained.)"

My differences with the majority are based upon its misapplication of the facts and my view of the law. The majority concludes, for example, "A reasonable jury could find that [MetroHealth] was substantially certain that Padney would contact this disease." The majority also concludes, "It was also aware that the CDC standards required ventilation equal to twelve total air changes per hour, but this isolation room only had six air changes per hour."

Not only does the majority skew the facts to reach its conclusions, but it misapplies *Fyffe.* As indicated earlier, the reference to six air changes per hour occurred ten years before the Ramos autopsy, and Dr. Nardell testified that he did not know the number of air changes per hour at the time of the autopsy. The majority has erroneously adopted the 1982 data and applied it to the 1992 facts in this case.

Further, *Fyffe* requires more. Proof beyond negligence or recklessness must be established. There is no evidence in this record to meet the *Fyffe* standard:

"[T]he employer knows that injuries to employees are certain or substantially certain to result from the * * * procedure * * * and he still proceeds, he is treated by the law as if he had in fact desired to produce the result."

There is evidence to suggest that MetroHealth *had an appreciation of the risk* of harm in performing this autopsy. However, as stated in *Fyffe*, paragraph six of the syllabus in *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, has now been amended to read in part:

"[T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent."

In its opinion, the majority suggests that evidence existed from which a jury could find that MetroHealth knew that harm to its employees was substantially certain to occur if subjected to this danger, citing a twenty-five to thirty-percent chance of contracting tuberculosis from a one-hour exposure. The facts of this case plainly do not reach the level of substantial certainty on three bases: one, per the analysis offered in *Fyffe* and *Van Fossen*, mere knowledge of a risk is not equivalent to intent; two, the uncontroverted evidence in this case establishes that for twenty years, no other MetroHealth employee had ever been infected with tuberculosis; and three, while the majority asserts a twenty-five to thirty-percent chance of contracting tuberculosis, the transcript reveals the following colloquy from the cross-examination of Dr. Nardell:

"Q. But you're sitting here on the stand. You have to give us your opinion. What is the percentage chance that he was going to get sick on that day?

"A. That he was going to get infected.

"Q. Infected, I'm sorry.

"A. Okay. Looks like somewhere around 25 to 30 percent.

"Q. Twenty-five to 30 percent chance that he is going to get infected?

"A. Yes.

"Q. And when you say infected, you mean being a converter?

"A. That's correct.

"Q. And could you tell us what the chances are of any converter, that that person would come down with the sickness?

"A. It's five to ten percent.

"Q. Five to ten percent. Let's go with the highest one. So, if he had a 30 percent chance of getting sick or being a converter, he then had a three percent chance of actually getting sick?

"A. Yes.

"Q. All right. And how many of the people who get sick with multi drug resistant tuberculosis actually pass away, around 50 percent?

"A. I would say fewer than that.

"Q. Less than—

"A. Fifty percent is an okay number.

"Q. So, at the time that Mr. Padney went into that room, he had a 1.5 percent chance of becoming fatally ill?

"A. By these assumptions, yes."

The significance of that testimony becomes relevant when compared with the analysis offered in *Pratta v. E.I. du Pont de Nemours & Co.* (Aug. 7, 1992), D.N.J., unreported, 1992 WL 695494, where Pratta claimed that he developed bladder cancer from exposure to chemicals from 1961 to 1973. He produced evidence that between 1954 and 1981, 8.3 percent of du Pont workers developed bladder cancer and argued that because historically a percentage of the workforce had developed cancer, it was substantially certain that other cases would occur and therefore du Pont committed an intentional tort. The court there concluded that a 8.3 percent risk did not rise to the level of substantial certainty; similarly, nor does a 3 percent chance of getting sick or a 1.5 percent chance of becoming fatally ill.

In my view, the evidence presented fails to establish a prima facie case of intentional tort, and, therefore, I believe that the trial court properly granted a directed verdict in favor of MetroHealth on this claim. Accordingly, I dissent.