656 S.E.2d 91

Allison J. RIGGS, and Jack E. Riggs,
M.D., Plaintiffs Below,
Appellants,

v.

WEST VIRGINIA UNIVERSITY
HOSPITALS, INC., Defendant
Below, Appellee.

No. 33335.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 23, 2007.

Decided Nov. 20, 2007.

Dissenting Opinion of Justice
Albright Nov. 28, 2007.

Dissenting Opinion of Justice
Starcher Dec. 26, 2007.

Concurring Opinion of Chief Justice
Davis Jan. 3, 2008.

Wesley W. Metheney Wilson, Frame, Benninger & Metheney, P.L.L.C. Morgantown, WV and Paul T. Farrell, Jr. Greene, Ketchum, Bailey, Walker Farrell & Tweel, Huntington, WV, for Appellants.

Christopher J. Regan, Bordas & Bordas, P.L.L.C., Wheeling, WV, for amicus curiae West Virginia Association for Justice.

Christina S. Vaglienti, West Virginia University Hospitals, Inc., Morgantown, WV and Rita Massie Biser, Moore & Biser, P.L.L.C., Charleston, WV, for Appellee.

Thomas J. Hurney, Jr., Jackson Kelly P.L.L.C., Charleston, WV, for amicus curiae West Virginia Mutual Insurance Company.

Michele Grinberg, J. Dustin Dillard, Flaherty, Sensabaugh & Bonasso, P.L.L.C., for amici curiae West Virginia Hospital Association and West Virginia State Medical Association.

PER CURIAM.

Appellants Allison J. Riggs and Jack E. Riggs, M.D. argue herein that the Circuit Court of Monongalia County erred by reducing a jury verdict awarding non-economic damages in the amount of $10,000,000 to $1,000,000 pursuant to the provisions of W. Va.Code § 55–7B–8 (1986).[1] According to Appellants, the non-economic damages cap contained in Section 8 of the Medical Professional Liability Act, W. Va.Code § 55–7B–1, *et seq.,* does not apply to the jury verdict rendered below because their claims against West Virginia University Hospitals, Inc. ("WVUH") do not arise from health care rendered to Allison Riggs. Instead, Appellants maintain that their claims arise from WVUH's failure to control an environmental serratia outbreak which resulted in Allison Riggs contracting a near fatal nosocomial serratia infection during an anterior cruciate ligament ("ACL") surgical reconstruction in 1995. As such, Appellants maintain the claims asserted against WVUH do not fall within the parameters of the MPLA's non-economic damages cap. Upon a complete and thorough review of the record presented herein, it is readily apparent that Appellants pled, prosecuted and tried their claims against WVUH as claims subject to the provisions of the MPLA. Only after a jury ver-

---

1. West Virginia Code § 55–7B–8 (1986), provides that "[i]n any medical professional liability action brought against a health care provider, the maximum amount recoverable as damages for noneconomic loss shall not exceed one million dollars and the jury may be so instructed." Although W. Va.Code § 55–7B–8 was substantially amended in 2003, those amendments are not at issue herein because the instant action was filed in 2001.

dict exceeding the MPLA's non-economic damages cap was rendered did Appellants begin to argue that their claims were not governed by the MPLA. Finding that Appellants may not change the theory of their case after the return of jury's verdict so as to avoid application of the MPLA's non-economic damages cap, we affirm the trial court's application of W. Va.Code § 55–7B–8 to the jury verdict rendered herein.[2]

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 4, 1995, Appellant Allison J. Riggs ("Ms. Riggs"), then 14 years of age, underwent an ACL reconstruction surgery in her right knee at WVUH's Ruby Memorial Hospital. During the surgery, Ms. Riggs allegedly contracted a serratia bacterial infection in the femoral tunnel of the ACL reconstruction surgical site. Ms. Riggs ex-perienced a number of complications after the surgery and underwent a number of subsequent procedures, including surgeries, during the years 1995 and 1996 allegedly as a result of these complications.[3] The infection at issue in this litigation, however, was apparently not discovered nor diagnosed until 1999.[4]

Appellants filed their Complaint in the Circuit Court of Monongalia County in March 2001, against WVUH, University of West Virginia Board of Trustees and West Virginia University Medical Corporation.[5] In their Complaint, Appellants alleged that at the time of Ms. Riggs' surgery in April 1995, Ruby Memorial Hospital was experiencing a serratia bacterial outbreak in certain areas of the hospital, including the operating rooms and surgical intensive care unit. All allegations in the Complaint were phrased in terms of proof required under the MPLA.[6] For example, the Complaint alleged that the

2. Though we are deciding this matter on grounds other than those articulated by the various *amici curiae*, we recognize and thank the entities filing *amici curiae* briefs for their contributions.

3. Evidence was presented at trial that during this time period the possibility that Ms. Riggs was suffering from an infection was explored. However, testing did not reveal the presence of an infection. Appellants further admitted in pre-trial filings that in 1995 and 1996 there was no evidence of infection, including no culture growth.

4. The infection at issue herein was discovered after the second of two surgeries Ms. Riggs underwent in 1999. Appellants asserted in pretrial filings that it was undisputed that at the time of Ms. Riggs' June 15, 1999 operation, there was no notation of a possible infection nor cultures, but that during a June 28, 1999, surgery, a "tremendous amount of bloody purulent material" was revealed and cultures indicated *"serratia marcescens* light growth." Prior to this discovery of the infection, it was believed that Ms. Riggs was experiencing an adverse reaction to the hardware inserted during her prior surgeries.

5. Prior to trial, appellants voluntarily dismissed their claims asserted against West Virginia Medical Corporation. Additionally, it appears they settled their claims asserted against the University of West Virginia Board of Trustees for the sum of $75,000.

6. West Virginia Code § 55–7B–3(a) (2003) provides:

The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
(2) Such failure was a proximate cause of the injury or death.
West Virginia Code § 55–7B–3(a) is identical to W. Va.Code § 55–7B–3 (1986) which was in effect at the time this action was file. The 2003 amendment to W. Va.Code § 55–7B–3 redesignated the existing statutory text as subsection (a) and added subsection (b), which is not at issue herein.
Additionally, W. Va.Code § 55–7B–2(g) (2006) defines "health care provider" as:
a person, partnership, corporation, professional limited liability company, health care facility or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, psychologist, emergency medical services authority or agency, or an officer, employee or agent thereof acting in the course and scope of such officer's, employee's or agent's employment.
This definition of "health care provider" is virtually identical to that contained within the 1986 enactment in effect at the time the instant action

Defendants negligently failed to exercise that degree of care, skill and learning required of or expected of reasonably careful healthcare providers acting in the same or similar circumstances in treating Plaintiff, Allison J. Riggs, and such negligence was the proximate cause of Plaintiff, Allison J. Riggs', exposure to the serratia bacteria and resulting complications.

More specific acts of negligence specified in the Complaint include: the failure to adequately and properly obtain informed consent; the failure to inform physicians, employees, agents and representatives of the serratia bacteria outbreak at Ruby Memorial Hospital; the failure to conduct proper testing, monitoring and preventive control of the serratia bacterial outbreak; and the failure to consult with health care providers with knowledge and experience in the field of bacterial infections, outbreaks, control and containment. Additionally, the Complaint alleged the Defendants negligently "failed to diagnose, detect and/or discover that the complications suffered by Plaintiff, Allison J. Riggs, were proximately caused by a serratia bacterial infection in the femoral tunnel of the anterior cruciate ligament reconstruction surgical site" and "failed to perform adequate and proper diagnostic testing to determine the source and/or origins of" Ms. Riggs' complications. Finally, the Complaint asserted that the alleged damages were caused "*as a direct and proximate result of the negligent failure of the Defendants to exercise the proper degree of skill, care and learning required of reasonably prudent healthcare providers.*" (Emphasis added).

Continuing with the theme that the MPLA applied to their claims, Appellants summarized their allegations in their pre-trial memorandum stating:

On or about April 4, 1995, the Robert C. Byrd Health Sciences Center of West Virginia University and Ruby Memorial Hospital w[ere] experiencing a serratia bacterial outbreak in certain areas of the health care facility including operating rooms and surgical intensive care units. The physi-

cians, employees, agents and representatives of the Defendants hereinbefore named negligently monitored the serratia outbreak, negligently disclosed its inherent dangers and committed other acts of negligence which proximately caused Plaintiffs to suffer significant personal injuries and damages.

As a direct and proximate result of the *negligent failure of the Defendants to exercise the proper degree of skill, care and learning required of reasonable prudent healthcare providers,* Plaintiff, Allison J. Riggs, was required to incur medical bills and suffer agonizing physical pain and suffering, mental anguish and anxiety and permanent physical injury. As a direct and proximate result of the *negligent failure of the defendants to exercise the proper degree of skill, care and learning required of reasonable prudent healthcare providers,* Plaintiff, Jack E. Riggs, incurred expenses and costs which were unnecessary and burdensome.

(Emphasis added). These allegations were then incorporated verbatim into the Pre-Trial/Scheduling Order entered by the trial court.

Appellants' acknowledgment that their claims against WVUH were subject to the provisions of the MPLA continued during the course of discovery as evidenced by their expert witness disclosures. In supplemental disclosures filed on June 14, 2002, Appellants disclosed the expert witness opinion of Grant O. Westenfelder, M.D., FACP, ("Dr. Westenfelder") relating to WVUH's Department of Infection Control "in this medical professional negligence case." Therein, Appellants disclosed that Dr. Westenfelder would "testify to a reasonable degree of medical probability" that WVUH "deviated from the standard of care" by failing to adequately inform and warn physicians, staff and patients regarding an "ongoing endemic/epidemic Serratia problem" and by failing to seek assistance from the West Virginia Department of Health and the Centers for Disease Control. According to the disclosure, these "deviations from the

---

was filed. The only difference is that this definition was amended in 2003 to include entities "professional limited liability company" and

"emergency medical services authority or agency" within its scope.

standard of care were a proximate cause of Plaintiffs' ultimate injuries and damages." On September 3, 2004, Appellants again supplemented their expert witness disclosures. At that time, Appellants admitted that "[t]his medical malpractice action arises out of an intra-operative infection[.]" Each expert disclosed therein as expected to testify against WVUH was represented to be testifying "to a reasonable degree of medical probability" that WVUH "deviated from the standard of care" in (1) determining the source of serratia infections; (2) investigating, remediating and monitoring a serratia epidemic "which proximately resulted in Ms. Allison Riggs' contracting a nosocomial serratia infection"; (3) "failing to implement appropriate standards to locate, identify, isolate and remediate a nosocomial serratia epidemic"; and/or (4) "failing to take appropriate affirmative actions to locate, identify, isolate and remediate a nosocomial serratia epidemic[.]"

Appellants' unequivocal position that their claims against WVUH were MPLA claims continued at the trial which commenced on August 22, 2006. During voir dire, Appellants' counsel informed the potential jurors that the injuries and damages they were claiming were "a result of the hospital failing to meet the applicable standard of care in monitoring the infectious disease control procedures within the hospital and perhaps in some other ways that they were guilty of medical negligence[.]" This position was further evidenced by Appellants' request that the jury be instructed regarding the legislative purpose behind the MPLA and the elements of a MPLA claim both by their proposed jury instructions and during arguments regarding the trial court's proposed jury charge. During discussions with the trial court regarding jury instructions, Appellants' counsel acknowledged that he "tried to state the statutory burden of proof verbatim" in his proposed instructions. Reviewing the trial court's suggestion regarding a proposed instruction, Appellants' counsel acknowledged "I think that's an accurate statement of medical malpractice or negligence, degree of care, skill and learning . . . I like it." At one point, Appellants' counsel maintained that he did not "want the statement that we are alleging that the hospital failed

to maintain a safe and proper hospital environment with respect to infection control" included in the jury instructions. At no time did Appellants request that the jury be instructed upon any theory of liability other than medical negligence nor were any objections raised to the instructions ultimately given by the trial court. The following portions of the jury charge are particularly relevant to the matters raised in this appeal:

The Court further instructs you that in cases involving allegations of *medical negligence* the law recognizes that the complexity of the human body and medical science places questions as to the *standard of medical care* beyond the knowledge of the average lay person. Therefore, the law requires that expert medical testimony be presented to establish the *standard of care to be exercised by medical care providers,* whether the defendant's conduct amounted to a deviation from the standard of care was a proximate cause of the injuries and damages of the plaintiffs.

The jury is instructed that the *medical care providers against whom medical negligence is asserted,* that is, the *healthcare providers at West Virginia University Hospitals,* by virtue of their education, training and experience, are qualified and entitled to give opinion testimony concerning the medical issues in this case as are the medical experts called by either the plaintiffs or the defendant in this case.

. . .

The Court instructs the jury that the plaintiffs, Allison J. Riggs and Jack E. Riggs, allege that the defendant, West Virginia University Hospitals, Inc., was *negligent in the care and treatment of Allison J. Riggs, by failing to maintain a safe and proper hospital environment with respect to infection control, and that such negligence proximately caused her injuries.*

. . .

For plaintiffs to recover on their claims, they must prove to you by a preponderance of the evidence that the *defendant was negligent in its care and treatment of*

*Allison J. Riggs* by failing to maintain a safe and proper hospital environment with respect to infection control, and that its negligence was also a proximate cause of Allison J. Riggs' injuries and damages. *Healthcare providers owe the patients they treat a duty to refrain from medical negligence.* "Medical malpractice or negligence" is the failure to treat a patient in accordance with the degree of care, skill and learning required of a reasonably prudent health care provider in the profession or class to which the defendant belongs acting in the same or similar circumstances which proximately causes injury to the patient. That is, a healthcare provider must have and use the same knowledge and skill and exercise the same care as that which is usually had and exercised in the medical profession. *A healthcare provider whose conduct does not meet this standard of care is negligent.*

The Court instructs you that at various times throughout this trial you have heard the term "standard of care." That term means the level of medical care that should be given by a healthcare provider in a given class at a given time and which is reasonably prudent under the circumstances. It is what you find from the evidence to be what is reasonable for a prudent and competent healthcare provider engaged in the same or similar practice to have done under the same set of circumstances.

The standard of care for medical professionals and healthcare providers is a national standard of care. *West Virginia University Hospitals is a healthcare provider under the law.*

*Plaintiffs allege that West Virginia University Hospitals deviated from the standard of care by negligently failing to prop-*

*erly conduct surveillance, prevention and control of a serratia epidemic proximately causing Allison J. Riggs to become severely ill and suffer injuries and damages.*

. . .

Accordingly, if you find from a preponderance of the evidence that, in treating Allison J. Riggs, the medical provider employees or agents of West Virginia University Hospitals failed to fulfill their duty or standard of care, then you may find that the defendant was negligent.

. . .

The jury is instructed that it must consider *the conduct of the healthcare providers based on the circumstances* at the time of their treatment of the plaintiff in other words what they knew or reasonably should have known at that time, and without the knowledge that Allison J. Riggs would develop any particular problem, complication, or condition, or would suffer or sustain injuries.

. . .

Before you can find the *defendant liable to plaintiffs in damages for malpractice, you must find not only that one or more of the healthcare providers of West Virginia University Hospitals deviated from the appropriate standard of care and was negligent, as to which you have been instructed, but also that this breach of duty was a proximate cause of or substantially contributed to Allison J. Riggs' injuries or damages.*

(Emphasis added).[7]

The clarity of Appellants' theory of the case presented to the jury was exemplified in

---

7. During post-trial proceedings and during oral argument before this Court, Appellants have attempted to argue that the re-typed jury charge signed by the trial court and entered into the record was not the actual jury charge read to the jury. More specifically, Appellants argue that the red-lined charge read to the jury did not use the terms "in the care and treatment of Allison J. Riggs" but rather "relating to the hospitalization of" Ms. Riggs. However, review of the portions of the record cited by Appellants in support of this argument do not lend the support implied by

counsel. During arguments relating to the formulation of the jury charge there was a discussion regarding this substitution. However, placing the discussion relied upon by Appellants in context, it appears that the substitution was in relation to a portion of the jury instructions regarding the actions of the infectious disease control employees who admittedly did not have direct contact with Allison Riggs. During post-trial hearings, the trial court rejected Appellants' argument that the jury charge entered in the

rebuttal closing arguments wherein counsel argued:

> You go to a hospital with the dependency and the confidence that what they are going to do to you isn't going to hurt you or inflict additional harm. And we depend on that. We depend on that environment. We don't go there to get sick. The hospital is to do no harm.
>
> . . .
>
> Now in a few minutes I am going to sit down and your job is going to begin. My job is going to end and you assume this awesome responsibility. We are going to ask that you return a verdict in favor of Allison Riggs. We have worked on this case over five years. Any mention of the investment of time and resources has been necessary and just on this issue in this town at this hospital.
>
> *A full and fair verdict for Allison Riggs in this case will send a message that you must provide medical services in this town responsibly. When this jury returns a verdict, a full and fair verdict for Allison Riggs, changes will occur.*
>
> Serratia marcescens at Ruby Hospital will get the attention it deserves. Staffing re-

quirements will be met. *Health care will be improved.* And yes, lives will be saved. *Holding people accountable creates consequences and change.* And I told you you would become the conscience of the jury. *You determine what a reasonably prudent health care provider should do. You get to say what the community standard on nosocomial infection, what you are willing to accept serratia bacteria in this town will be.* You get to say that. I don't have that power. The hospital doesn't have that power.

(Emphasis added.) After receiving the trial court's instructions and listening to closing arguments, the jury began deliberations and were presented with a jury verdict form consisting of two primary questions: 1) whether WVUH was negligent in its care and treatment of Ms. Riggs by failing to maintain a safe and proper hospital environment with respect to infection control and 2) whether any such negligence proximately caused or contributed to plaintiffs' damages.[8] Appellants did not object to the use of this verdict form. Answering both questions in the affirmative, the jury assessed special damages in the amount of $84,989.39 and general damages in the amount of $10,000,000 on September 5, 2006.

---

record did not reflect the actual charge given by stating that the trial court had compared the re-typed version entered in the record to the typed copy which included the hand-written notes utilized at trial and verified that the re-typed version corresponded to the marked-version read at trial. Responding to an inquiry from Appellants' counsel regarding the document with hand-written notes utilized at trial, the trial court explained "[t]he retyped jury charge is what I read ... I did [read from a document that I made writings on] and then I gave it to Janet and she incorporated it and typed it exactly the way it was and I sort of go through in kind comparing it."

8. The verdict form read, in its entirety:

> *Question No. 1:* Do you find by a preponderance of the evidence that West Virginia University Hospitals, Inc., was *negligent in its care and treatment of plaintiff,* Allison J. Riggs, by failing to maintain a safe and proper hospital environment with respect to infection control? Yes____ No____
> If you answered "No" to Question No. 1, *STOP HERE.* Have your foreperson sign and date this form and notify the Bailiff that a verdict

has been reached. If you answered "Yes" to Question No. 1, go to Question No. 2.
> *Question No. 2:* Do you find by a preponderance of the evidence that any such negligence by West Virginia University Hospitals, Inc., proximately caused or contributed to plaintiffs' damages? Yes____ No____
> If you answered "No" to Question NO. 2, *STOP HERE.* Have your foreperson sign and date this form and notify the Bailiff that a verdict has been reached. If you answered "Yes" to Question No. 2, go the "Damages" portion of this form.
> *DAMAGES:* We, the jury, find by a preponderance of the evidence that the total amount of damages to be assessed are as follows:
> A. Jack E. Riggs–Special damages (medical expenses to date): $____
> B. General damages any permanent injury, past pain and suffering, mental anguish and past and future loss of enjoyment of life. $____
>
> ____
> FOREPERSON
> ____
> DATE
> (Emphasis added).

The trial court entered a judgment order reflecting the jury verdict and reducing the general/non-economic damage award to $1,000,000 pursuant to the provisions of W. Va.Code § 55–7B–8 (1986) on September 12, 2006. On September 18, 2006, Appellants filed a motion pursuant to Rule 59(e) of the *West Virginia Rules of Civil Procedure* to reinstate the damages awarded in the jury order arguing that the MPLA's non-economic damages cap did not apply [9] because "no allegation has been made that WVUH negligently rendered care directly to Allison Riggs" and that the MPLA's non-economic damages cap was unconstitutional despite being upheld against constitutional challenges twice before by this Court. At a September 29, 2006, hearing on post-trial motions, Appellants began articulating a position that the MPLA applied only if personnel from the infection control department actually provided hands-on care to Allison Riggs. Specifically, counsel argued:

> So if you want to broadly interpret the MPLA to include claims against infection control, then the non-economic cap applies. If you want to narrowly interpret the actual words of the statute, I think it's reasonable to find that in this instance the claims that we have alleged do not involve health care services which were actually rendered by infection control to Allison Riggs. This is an administrative function involving the environmental safety of the hospital and is no different from negligent credential[ing] which was specifically carved out of the MPLA in the *Boggs* decision.

The trial court orally denied Appellants' motion at the hearing finding a definitional analysis of the MPLA's terms reveals that a

showing "that anybody in infection control did directly render care to Allison Riggs" was not required for the claims to fall within the MPLA. A formal written order denying Appellants' Rule 59(e) motion to reinstate the damages awarded by the jury was entered on October 26, 2006. It is from this order that the instant appeal arises.[10]

## II.

## STANDARD OF REVIEW

■ The sole issue on appeal is whether the trial court properly denied Appellants' Rule 59(e) motion to reinstate the damages awarded by the jury. In syllabus point 1 of *Wickland v. American Travellers Life Insurance Company*, 204 W.Va. 430, 513 S.E.2d 657 (1998), this Court found that "[t]he standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." As the issue raised directly challenges the trial court's application of the MPLA's non-economic damages cap to the jury verdict, our review is *de novo*. Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). It is also clear that " '[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.' Syllabus

---

9. This argument is directly contrary to Appellants' counsel's admissions to the trial court during discussions relating to jury instructions and Appellants' request to instruct the jury regarding legislative findings included within the MPLA. After discussing Appellants' proposed instruction number 1 and legislative findings regarding an insurance crisis in this State as supporting the MPLA, counsel stated *"let's say by some chance we win and we have all these caps that come in to reduce the verdict.* If that happens, this hospital is self-insured so all those caps for the benefit of an insurance crisis I'm going to argue are inapplicable to a self-contained limit." (Emphasis added).

10. When petitioning this Court to review the October 26, 2006, order, Appellants raised two issues: 1) the trial court's application of the MPLA's non-economic damages cap and 2) the constitutionality of the non-economic damages cap. This Court granted review as to the first issue only. Additionally, WVUH filed a cross-petition for appeal raising three issues: 1) improper and prejudicial remarks during closing argument; 2) excessiveness of the jury verdict; and 3) that the verdict was against the clear weight of the evidence. This Court denied WVUH's petition for cross appeal.

Point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars,* 144 W.Va. 137, 107 S.E.2d 353 (1959)." Syl. Pt. 4, *State v. Inscore,* 219 W.Va. 443, 634 S.E.2d 389 (2006). Accordingly, our review is focused upon whether the trial court properly applied W. Va.Code § 55-7B-8 to reduce the jury's non-economic damages award from $10,000,000 to $1,000,000 under the facts and circumstance of this case.

## III.

## DISCUSSION

On appeal to this Court, Appellants argue that the MPLA's non-economic damages cap does not apply to the jury verdict unless WVUH's infection control department had direct contact and involvement in the care and treatment of Allison Riggs during her hospitalization.[11] Rather, Appellants maintain that their claims arise out of environmental conditions at the hospital and thus do not fall within the parameters of the MPLA. The fundamental problem with this argument, as recognized and argued by WVUH before this Court, is that Appellants pled, developed, argued and submitted their claims to the jury as governed by the MPLA, If Appellants are attempting post-verdict to re-define their claims in terms of a premises liability theory arising from an environmental contamination in order to avoid application of the MPLA's non-economic damages cap, a fundamental problem exists—the jury was not instructed on any premises liability theory of recovery, Appellants did not request such an instruction and the verdict form

utilized by the jury did not include findings on a premise liability theory of recovery.

This Court recently discussed at length the doctrine of judicial estoppel and its importance in maintaining the integrity of our judicial system. In *West Virginia Department of Transportation, Division of Highways v. Robertson,* 217 W.Va. 497, 618 S.E.2d 506 (2005), we stated:

> The doctrine of "[j]udicial estoppel is a common law principle which precludes a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or a prior litigation." *In re C.Z.B.,* 151 S.W.3d 627, 633 (Tex.Ct.App.2004). Under the doctrine, a party is "generally prevent[ed] . . . from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 2154, n. 8, 147 L.Ed.2d 164, 180 n. 8 (2000). This Court recognized long ago that "[t]here are limits beyond which a party may not shift his position in the course of litigation[.]" *Watkins v. Norfolk & Western Ry. Co.,* 125 W.Va. 159, 163, 23 S.E.2d 621, 623 (1942). Thus, " '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' " *Hubbard v. State Farm Indem. Co.,* 213 W.Va. 542, 552 n.

---

11. In support of this argument, Appellants rely heavily upon a stipulation incorporated into the order approving the partial settlement with the University of West Virginia Board of Trustees (also referred to in the record as the Board of Governors) which was entered on October 16, 2006. In that order, the trial court notes that WVUH did not object to the settlement and stipulated that the Rashida Khahoo, M.D. and Bonny McTaggart, R.N., employees of WVUH's infection control department, did not provide medical or nursing care or treatment to Allison J. Riggs. However, reading the matters stipulated in their entirety reveals that this stipulation is related to any alleged agency and/or employment relationship between these individuals, WVUH and the Board of Trustees. The limited nature of this stipulation is further evidenced by a letter sent by

counsel for WVUH to the trial court prior to the entry of this order. That letter, dated October 11, 2006, stamped received on October 13, 2006, and entered into the record in this matter states, in its entirety:

> West Virginia University Hospitals, Inc. does not object to the proposed Order submitted by Mr. Farrell [Appellants' counsel] concerning the August 10, 2006 hearing to approve plaintiffs' settlement with the West Virginia University Board of Governors.
> WVUH, Inc. will object, however, to any attempt by plaintiffs' counsel to use the stipulations concerning Dr. Khakoo and Bonny McTaggart to argue plaintiffs' case against WVUH is or was anything other than a medical professional liability case [sic] of action.

21, 584 S.E.2d 176, 186 n. 21 (2003) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968, 977 (2001)). *See also* Syl. pt. 2, *Dillon v. Board of Educ. of Mingo County,* 171 W.Va. 631, 301 S.E.2d 588 (1983) ("Parties will not be permitted to assume successive inconsistent positions in the course of a suit or a series of suits in reference to the same fact or state of facts."); *Gelwicks v. Homan,* 124 W.Va. 572, 583, 20 S.E.2d 666, 671 (1942) ("One may not defend a suit upon one ground, and then later defend the same suit, or one growing out of the same transaction, on grounds separate and distinct from those formerly asserted[.]").

"Judicial estoppel is an extraordinary remedy that should be invoked only when a party's assertion of a contrary position will result in a miscarriage of justice and only in those circumstances where invocation of the doctrine will serve its stated purpose[.]" *Puder v. Buechel,* 362 N.J.Super. 479, 828 A.2d 957, 965 (2003). *See also Cothran v. Brown,* 357 S.C. 210, 592 S.E.2d 629, 632 (2004) ("The application of judicial estoppel must be determined on a case-by-case basis, and must not be applied to impede the truth-seeking function of the court."). The "dual goals [of the doctrine] are to maintain the integrity of the judicial system and to protect parties from opponents" unfair strategies. *People ex rel. Sneddon v. Torch Energy Servs., Inc.,* 102 Cal.App.4th 181, 125 Cal.Rptr.2d 365, 370 (2002). The doctrine fulfills its goals by "bind[ing] a party to his or her judicial declarations, and precludes [that] party from taking a position inconsistent with previously made declarations in a subsequent action or proceeding." *Kauffman–Harmon v. Kauffman,* 307 Mont. 45, 36 P.3d 408, 412 (2001).

*Robertson,* 217 W.Va. at 504–05, 618 S.E.2d at 513–14 (footnotes omitted). Upon examination of the factors utilized in various jurisdictions for the application of judicial estoppel, we held in syllabus point 2 that:

> Judicial estoppel bars a party from relitigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process.

Applying these factors to the instant matter it is plainly evident that the doctrine of judicial estoppel applies to preclude Appellants from arguing that their claims against WVUH are anything other than claims governed by the MPLA, including the MPLA's non-economic damages cap. The first factor looks to whether the party has assumed a position clearly inconsistent with one taken earlier in the case. As noted throughout this opinion, Appellants pled, prosecuted, tried and argued their claims as falling within the MPLA, including continual references to WVUH as a healthcare provider, breaches of the applicable standard of care to a reasonable degree of medical probability and characterizations of the action as a medical professional liability action. Moreover, the verdict form utilized, *without objection from the Appellants,* specifically contradicts the position taken by the Appellants post trial. The verdict form specifically asked the jury whether WVUH was "*negligent in its care and treatment*" of Allison J. Riggs. Appellants did not assume the position that their claims were not governed by the MPLA until *after* a verdict in excess of the MPLA's non-economic damages cap was rendered and their verdict was reduced by order of the trial court.

The second factor regarding the identity of the parties is easily satisfied as the contradictory positions raised by Appellants on appeal are being taken in the same litigation. Likewise, the third factor involving benefit achieved by assuming an inconsistent position is easily satisfied. By characterizing their claims as medical negligence claims, the Appellants' were able to attempt to invoke strong emotional responses and a sense of authority from the jury in their closing argu-

ments. In their rebuttal closing arguments, Appellants strongly encouraged the jury to "send a message that you must provide medical services in this town responsibly ... changes will occur ... health care will be improved ... you decide what a reasonably prudent health care provider should do ... you say what the community standard ... will be." Additionally, if the adverse position is accepted, Appellants will receive an additional $9,000,000 in non-economic damages. Lastly, the final factor involving misleading the opposing party and injurious affect on the integrity of the judicial process is clearly met herein. By not characterizing their claims as premises liability claims until *after* the jury verdict was rendered, Appellants precluded WVUH from developing a theory of defense on this theory. There was no alternative pleading or arguments made herein. Appellants proceeded at all times prior to entry of the judgment order applying the MPLA's non-economic damages cap as if their claims were governed by the MPLA. This Court will not sanction a change in liability theories post-verdict to avoid application of clear statutory provisions. The doctrine of judicial estoppel applies to preclude Appellants' arguments that the MPLA does not apply to the jury verdict rendered herein. Accordingly, the trial court's application of W. Va.Code § 55–7B–8 to reduce the jury verdict rendered in this matter from $10,000,000 to $1,000,000 is affirmed.

## IV.

## CONCLUSION

For the reasons set forth herein, the October 26, 2006, order of the Circuit Court of Monongalia County is affirmed. The provisions of W. Va.Code § 55–7B–8 apply to the verdict rendered in this matter and the Circuit Court of Monongalia County did not err by reducing the jury verdict to $1,000,000 in its September 11, 2006, judgment order.

Affirmed.

1. Appellants argued that the instructions given in this case did not refer to the "care and treatment of Allison J. Riggs" but instead just referred to the hospitalization of Ms. Riggs.

Chief Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justices STARCHER and ALBRIGHT dissent and reserve the right to file dissenting opinions.

ALBRIGHT, Justice, dissenting:

(Filed Nov. 28, 2007)

By relying exclusively on judicial estoppel to address the issue of whether Appellants could alter their pleadings post-verdict, the majority both obscured and ignored the importance of Rule 15(b) of the West Virginia Rules of Civil Procedure in our jurisdiction. Moreover, by overlooking the use of Rule 15(b), the majority has sent a message, perhaps unwittingly, to the trial courts of this state regarding the impermissibility of amending pleadings to conform to the evidence.

Under Rule 15(b), courts are permitted to freely amend pleadings "[w]hen issues not raised by the pleadings are tried by *express or implied consent* of the parties." W. Va. R. Civ. Pro. 15(b) (emphasis supplied). The amendment of pleadings is permitted even after judgment under Rule 15(b) for the purpose of causing the pleadings to conform to the evidence. While Appellants did not rely on Rule 15(b), they could have relied upon it to make their arguments post-verdict that the case, as tried, was outside the confines of the Medical Products Liability Act [1]

From the record it is clear that the verdict form sent to the jury was couched in terms of the hospital's negligence arising not from the direct provision of medical treatment to the plaintiff but as a result of "failing to maintain a safe and proper hospital environment with respect to infection control." As Appellants' counsel argued on appeal, the manner in which this case went to the jury was significantly altered from how it was originally pled both in terms of the parties [2] against whom liability was sought and in

2. By the time this case went to trial, the only remaining defendant was West Virginia University Hospitals ("WVUH"). WVUH had by stipulation agreed that the individually named defendants "did not provide medical care or treatment" to the plaintiff.

terms of the allegations of harm from the original pleading of the case.[3] Significantly, the focus of the case as presented to the jury for deliberation was the violation of a duty to provide a proper disease-free environment rather than negligence arising from the direct provision of medical care to the plaintiff.

For the majority to have solely looked to the doctrine of judicial estoppel as a means of prohibiting any post-verdict amendment of pleadings and to omit any discussion of the procedural workings of Rule 15(b) was clearly shortsighted. In those cases in which the evidence adduced at trial departs from the four corners of the pleadings, there is a procedural mechanism in place that expressly permits the amendment of pleadings. Under the clear and indisputable authority of Rule 15(b), cases should be decided on the issues that were tried and the pleadings can permissibly be amended as late as post-verdict when necessary to conform to the evidence adduced at trial. By overlooking the significance of Rule 15(b), the majority has downplayed the objective at the heart of the rule a clear sanctioning of the necessary procedural flexibility that trial lawyers require as a means of responding to inevitable alterations in the theory of a case. Moreover, I submit that to deny litigants the opportunity to conform their pleadings to the evidence adduced at trial violates not only the spirit of the rules of civil procedure to fairly decide cases on their merit, but also the "letter" of Rule 15(b) of the West Virginia Rules of Civil Procedure.

Accordingly, I respectfully dissent.

STARCHER, J., dissenting:

(Filed Dec. 26, 2007)

I have read, and re-read, and re-re-read, the majority's opinion. I don't know what was in the Kool–Aid they were drinking, but I believe that the opinion is one of the most factually misleading and legally pernicious cases to be produced by this Court.

Make no mistake—a West Virginia jury heard from all the witnesses for both sides, and decided that West Virginia University Hospitals ("WVUH") failed to provide Allison Riggs with a safe, *serratia*-free environment. Ms. Riggs is the daughter of Dr. Jack E. Riggs, a physician who works at WVUH. She was only fourteen when she contracted her *serratia* infection at WVUH, and suffered through years of pain and additional surgeries.

No one says that the jury was wrongly instructed. No one says they didn't hear all the evidence. In fact, the majority opinion doesn't even bother to address the evidence produced at trial. Worse, the majority opinion doesn't address the substantive legal arguments that were raised by the parties in their petitions for appeal.

Instead, the majority's opinion is based exclusively on a discretionary, judge-made doctrine called "judicial estoppel." Courts may apply the doctrine on a whim, but they usually limit its application to prevent a party from abusing the court system.

In this case, the majority opinion uses the judicial estoppel doctrine to avoid having to address the merits of the parties' legal arguments. The majority opinion never addressed how to interpret the relevant portions of the Medical Professional Liability Act ("MPLA"), namely *W. Va. Code*, 55–7B–8. And to apply the judicial estoppel doctrine, the majority opinion totally misconstrues the record, outright ignoring anything that might have supported Ms. Riggs' position.

The result is a complete perversion of justice.

A.

*The Majority Opinion is Factually Wrong*

In this case, a jury decided that plaintiff Allison Riggs had suffered mightily as a re-

---

**3.** There was also a dispute among the parties as to whether the record accurately reflected the jury charge due to the court reporter's failure to record the trial court's reading of the jury charge. Appellants argued that the jury charge in the record did not comport with that given by the trial court, stating that the words "in the course of treatment" were removed and replaced with "relating to the hospitalization of." While the record on this issue is less than clear due to the non-transcription of the judge's reading of the charge, there is no question from the language of the verdict form that Appellants asked the jury to determine negligence not based on the provision of medical care but based upon the failure to "maintain a safe and proper hospital environment with respect to hospital control."

sult of her treatment at West Virginia University Hospital. She entered the hospital on April 4, 1995 for a simple surgery to fix a torn anterior cruciate ligament. That one surgery turned into a four-year journey of infection, pain and six additional surgeries. WVUH tried to pass Ms. Riggs' *serratia* infection off as a routine infection acquired in the community. The plaintiffs, in discovery, found that was not true. WVUH's own records revealed that epidemics *of serratia* had been declared in 1991 and 1993. Investigations found *serratia* on mops, in buckets, and wet places; essentially, attempts by janitors to eliminate the bacteria resulted in its spread to additional areas of the hospital. When Ms. Riggs had her surgery in 2005, WVUH had documented 106 additional cases—enough for the hospital to have a "high index of suspicion" that another epidemic was underway.

The plaintiff brought suit against WVUH in 2001. The plaintiff also brought suit against the physician who performed her surgery, Dr. William Post (or more specifically, against Dr. Post's employer, the University of West Virginia Board of Trustees). The plaintiff generally alleged negligence by Dr. Post and WVUH. Dr. Post's employer subsequently settled, and the case proceeded to trial solely against WVUH because of its failure to maintain a safe, *serratia*-free environment.

A jury heard the evidence, found that WVUH had been careless, and awarded Ms. Riggs $10,000,000.00 in damages for her pain, her suffering, her fears, her anguish, her lost opportunities to have a normal teenage experience. The circuit judge, who also heard the evidence, ruled that the verdict was fair and was supported by the evidence.

But the circuit judge, acting *sua sponte*, believed that *W. Va.Code*, 55–7B–8 [1986] limited the plaintiff to only recovering $1,000,000.00 in non-economic damages. And

so, the circuit judge reduced the verdict to the statutory amount when the final judgment order was entered.

The plaintiff's attorneys filed a motion asking the circuit judge to reconsider the judgment order, and argued that the cap on damages found in *W. Va.Code*, 55–7B–8 applies only to a "medical professional liability action." "Medical professional liability" is defined as any liability "based on health care services rendered ... to a patient." *W. Va. Code*, 55–7B–2. The plaintiff's attorneys argued that the facts produced at trial showed that WVUH did not render any health care services specifically to Allison Riggs. The jury's verdict was based upon WVUH's failure to maintain a safe, infection-free environment for anyone who entered the hospital (patients, visitors and employees alike).[1] Hence, this was an environmental or premises liability case, not a medical professional liability case. By the pure terms of *W. Va. Code*, 55–7B–8, the cap on non-economic damages simply didn't apply.

WVUH filed a response to the plaintiffs' motion, and concluded that it was "undisputed" that the medical professionals in the hospital's infection control department did not "provide[ ] direct medical care to Allison Riggs." Still, WVUH argued that the damages cap in *W. Va.Code*, 55–7B–8 protects all persons who provide health care, and not just those health care providers who provide direct, hands-on patient care.

The circuit judge accepted WVUH's position, and denied the plaintiff's motion to reinstate the $10,000,000.00 jury award. The circuit judge concluded that a hospital's infection control department was encompassed within protection of the damages cap.

The plaintiffs' attorneys reiterated their positions to this Court. This Court granted the plaintiffs' appeal, ostensibly to resolve

---

1. For instance, what if a patient or a visitor slipped on ice at the hospital's entrance, because the hospital failed to treat the ice with salt or sand? What if a patient or a visitor got food poisoning from food cooked in the hospital cafeteria? In either case, any liability against the hospital would not be "based upon health care services rendered ... to a patient."

Likewise, in this case, patient Allison Riggs sustained a *serratia* infection. But what if one of her parents or friends got a *serratia* infection while visiting her in the hospital? Would the hospital's liability be reduced, even though the hospital rendered no health care services whatsoever to the person who was infected?

the pure legal question of how *W. Va.Code*, 55–7B–8 applied to the facts of this case.

On appeal, the plaintiffs' attorneys argued that, by its strict terms, the damages cap in *W. Va.Code*, 55–7B–8 only applies to protect medical professionals who provide hands-on care "to a patient." The plaintiffs' attorneys said, at oral argument, that you could call this case whatever you wanted: a medical malpractice case, an environment case, or a premises liability case. Whether the MPLA as an amorphous whole "applied" to the case was not the question. The plaintiffs' attorneys argued that generic, administrative functions applicable to everyone who enters the hospital, patient or not, were not encompassed by *W. Va.Code*, 55–7B–8. Because the facts before the circuit court showed that Ms. Riggs was injured by the hospital environment and not as a result of any direct care from WVUH, the plaintiffs' attorneys argued that *W. Va.Code*, 55–7B–8—by its own terms—did not apply.

WVUH, however, asserted before this Court that the plaintiffs were taking an entirely new legal position that contradicted their position before the circuit court. WVUH re-interpreted the plaintiffs' argument, and claimed that the plaintiffs' attorneys were essentially arguing that their case was no longer a medical malpractice case. Even though, factually, the plaintiff was injured because of the hospital environment and not any specific treatment "rendered ... to a patient," WVUH argued that legally, because the plaintiffs' attorneys had used the generic term "medical malpractice" throughout the course of the lawsuit, then the medical malpractice damages cap of *W. Va.Code*, 55–7B–8 had to apply. WVUH essentially claimed surprise at learning that the plaintiff's case centered on the hospital environment, rather than treatment by hospital employees. WVUH argued that the plaintiffs were "changing their theory of liability and the law applicable to their claims." In other words, facts be damned, WVUH took the position that the plaintiffs should be judicially estopped from arguing about how to interpret and apply *W. Va.Code*, 55–7B–8.

The position taken by WVUH is, in a word, absurd. Virtually from the outset of this case, WVUH knew the plaintiffs' case against the hospital focused on the environment, on the premises, and not on treatment rendered specifically to Allison Riggs. You might think "absurd" is too harsh a word, but let me demonstrate.

In 2002, the parties in this case were embroiled in a heated discovery dispute. The plaintiffs' attorneys wanted to review certain patient records held by WVUH—the records that subsequently showed an epidemic of *serratia* was occurring when the plaintiff had surgery in 1995. The hospital, of course, objected to producing these records. When the circuit court ordered the hospital to produce the records, the hospital petitioned this Court for a writ of prohibition to halt enforcement of the circuit court's order.

In the petition filed with this Court on September 19, 2002, WVUH repeatedly characterized the plaintiffs' lawsuit as *centering on the hospital environment*, not on any treatment provided directly to any patient. As WVUH stated in its petition (with emphasis added):

> The Petitioner WVUH denies Respondents' allegations and asserts that, to a reasonable degree of medical probability, the *serratia* bacteria was not introduced during the surgery performed by Dr. Post at WVUH on April 4, 1995. WVUH further asserts that the *environment* at WVUH in April, 1995 did not cause or contribute to Allison's infection ... and did not increase her risk of contracting an infection....

The memorandum of law that accompanied WVUH' petition described the plaintiffs' case in the following manner (with emphasis added):

> Plaintiffs allege that the *environment* at WVUH in April, 1995, increased Allison Riggs' risk of contracting a *serratia* infection ...

Read that again. In 2002, WVUH knew the plaintiffs' case against WVUH centered on the hospital *environment*, not on any treatment rendered to the plaintiff by any employee of the hospital. Yet somehow, in 2007, WVUH claims total surprise upon hear-

ing the plaintiffs' argument that the facts presented to the jury centered on the hospital environment, and not on any treatment rendered to the plaintiff. So, even though *W. Va.Code,* 55–7B–8 doesn't logically apply to these facts, WVUH argues the statute must still be applied because, golly, anything else would just be unfair.

WVUH is certainly entitled to argue its view of the record, within ethical limits; But the snippets of record contained in the hospital's brief just aren't representative of the record as a whole. I've looked at the record; clearly, the majority opinion didn't. That happens from time to time. How else could the majority opinion claim hold that "[b]y not characterizing their claims as premises liability claims until *after* the jury verdict was rendered, [the plaintiff] precluded WVUH from developing a theory of defense on this theory"? 221 W.Va. at 656, 656 S.E.2d at 101.

But the fact that the majority opinion chose to virtually cut-and-paste from the factual discussion in the defendant's brief, and follow the hospital down into its rabbit hole, is—in my humble opinion—horrifying.

For example, the majority opinion mimics the defendant's brief and incorrectly states:

> At one point, Appellants' counsel maintained that he did not "want the statement that we are alleging that the hospital failed to maintain a safe and proper hospital environment with respect to infection control" included in the jury instructions. At no time did Appellants request that the jury be instructed upon any theory of liability other than medical negligence nor were any objections raised to the instructions ultimately given by the trial court.

221 W.Va. at 650, 656 S.E.2d at 95.

The trial record, however, shows numerous objections by counsel for Ms. Riggs during the parties' extensive discussions with the circuit judge about the jury instructions. The trial record also shows many of the quotes relied upon by the majority opinion were taken entirely out of context.

Most importantly, the transcript of the parties' jury instruction discussions shows absolutely that counsel for Ms. Riggs, counsel for WVUH, and the circuit judge were all in agreement that the trial was focused exclusively on the hospital's failure to maintain a safe environment. All parties to the discussion were clear that no care was rendered directly to Ms. Riggs. As the record reads (with emphasis added):

> Plaintiff's counsel: . . . And when you back up and look at page 7 . . . there is a restatement of my case the way [defense counsel for WVTJH] writes it . . .
>
> I don't want the statement that we are alleging that the hospital failed to maintain a safe and proper hospital environment with respect to infection control. That's not all my case is. My case is a little more complicated than that and a little more broad than that.
>
> The Court: Sure.
>
> Plaintiff's counsel: It kind of raises my feathers when I read how [defense counsel] characterized our case in her jury instructions and then it found its way on two occasions in the jury charge. If there is any characterization, I would like to have some input into that.
>
> The Court: On page 7, all that was an attempt to do was to preliminarily tell the jury, you know, to kind of start out and say here is what this case is about, and it started out to be a lot more general than that and I would add a few words and add a few more words until I ended up with what I had, but, generally speaking, I think it's correct. You are alleging they failed to maintain a safe and proper hospital environment with respect to infection control. All she had in hers was to maintain the hospital environment. The rest of the adjectives and modifications I added, safe and proper, and then with respect to infection control because that's what this is about.
>
> Defense counsel: Your honor, I don't have any objection to using his statement. I was trying to submit a jury instruction based on what I thought the scope of their allegations were. If they want to define them more specifically, I don't have an objection to that.

\* \* \*

Plaintiff's counsel: ... There is also a statement a couple lines down "in the care and treatment of Allison J. Riggs." I think that may be unnecessary in this case because we are not alleging the infection control department actually cared for or treated Allison Riggs.

The Court: Right. That's in there a number of places ... A number of places....

Plaintiff's counsel: Here is my thought on that. You're right. I think that what [defense counsel] wants to emphasize is that she was not a patient of Dr. Khakoo's or Bonnie McTaggart's, but I think that there was a duty owed by the infection control department to Allison Riggs and that in that context they did owe her a duty of care.

Defense counsel: Your Honor, if I could make a recommendation. ... I think one of the ways to deal with it is to talk about it in terms of Allison Riggs' hospitalization or when she was hospitalized because that's the duty. **The duty is to provide a proper environment while she is there. We are not providing direct care to her. The infection control department, their duty has to do with the entire hospital infection control process.**

So, when I was going through this I had a concern about the same thing because **there isn't any evidence that any of these people provided direct care to her.**

The Court: Well, you want me to strike "in the care and treatment" and insert "relating to the hospitalization of."

Defense counsel: Yes....

There is just no other way to read this transcript. During the trial—before the jury was instructed—counsel for WVUH conceded that the plaintiffs' entire case centered upon the hospital's failure to "provide a proper environment" to the plaintiff. Counsel for WVUH had even proffered a jury instruction about "maintain[ing] the hospital environment," an instruction which the circuit court beefed up to read "failed to maintain a safe and proper hospital environment with respect to infection control."

So, for WVUH to come before this Court and claim surprise about the plaintiffs' trial theory baffles me.

But the majority opinion simply ignored these, and other, sections of the record. The end result was to make it look as though, after the jury returned its verdict, WVUH was totally surprised by a new theory proposed by the plaintiff's attorneys and—as the majority opinion states "precluded ... from developing a theory of defense on this theory."

### B.

#### *The Majority Opinion is Legally Wrong*

By re-casting the procedural history of this case, the majority opinion made it look as though the plaintiff was before this Court with "dirty hands" while WVUH was innocent and surprised. The application of the doctrine of judicial estoppel was then easy and assured.

The problem is, by using judicial estoppel the way it was used in this case, the majority opinion has unintentionally but virtually obliterated many of the *Rules of Civil Procedure*. Prior to the adoption of the *Federal Rules of Civil Procedure* in 1938, and the *West Virginia Rules of Civil Procedure* in 1960, much of legal procedure was game of "gotchas." Plaintiffs and defendants had to plead their legal theories and facts with precision. A plaintiff had to specifically say whether he was bringing an action of covenant, debt, detinue, replevin, trespass, assumpsit, ejectment, or case, and so on. Any mistake was grounds for a case being dismissed.

After the adoption of the federal and state *Rules of Civil Procedure*, parties only had to plead their case or their defenses by giving "notice" to the opposing party. That means a complaint or an answer only had to paint the alleged facts and legal theories with a broad brush, with enough specificity to put the opposing party on notice.

The new *Rules* also contained provisions allowing parties to conduct discovery, to learn facts about their own case and their opponent's case from each party. As each party learned new facts, they might also have

discovered new causes of action against their opponent. And so, the new *Rules* permitted parties to amend their pleadings to conform to the facts—even if those facts were learned in the middle of a trial, or even after the jury had already returned a verdict.

The majority opinion totally ignored the *West Virginia Rules of Civil Procedure*, and in the process may have accidentally eviscerated forty seven years of progress. The majority opinion says that the plaintiff in this case could not challenge the application of a statute to her case (because the facts did not warrant its application), simply because the plaintiff called her case a "medical malpractice" action. Even though WVUH was on notice that the plaintiffs' lawsuit was based on the hospital environment and not its treatment of the plaintiff, because the plaintiff did not specifically plead that fact and did not specifically plead, in her 2001 complaint, that the medical malpractice cap in *W. Va.Code*, 55–7B–8 did *not* apply to her case, then . . . well, then the statute applies. Gotcha.

"Judicial estoppel" [2] is a discretionary doctrine, invented by courts, and applied by courts to prevent a party from contradicting previous *declarations* or *statements* made in

**2.** Also known as "doctrine of preclusion of inconsistent positions" and "doctrine of the conclusiveness of the judgment."

**3.** *Am.Jur.2d*, Estoppel, § 34, states that the following five circumstances are often required in order for the doctrine of judicial estoppel to apply:

(1) the two inconsistent positions must be taken by the same party or parties in privity with each other, although it has been held that identity of the parties is not necessarily required for the application of judicial estoppel; (2) the positions must be taken in the same or related proceedings involving the same parties or parties in privity with each other; (3) the party taking the positions must have been successful in maintaining the first position and must have received some benefit or unfair advantage, or the opposing party is prejudiced by the changed argument, although there is also authority holding that no benefit need be obtained; (4) the inconsistency must be part of an intentional effort to mislead the court that courts should not tolerate, although the doctrine of judicial estoppel does not apply when the prior position was taken because of inadvertence, mistake, or is an innocent inconsistency or

the same or an earlier proceeding with an intent to mislead the court. As *Am.Jur* suggests, the two positions taken by the party must be totally inconsistent—that is, the truth of one statement must necessarily preclude the truth of the other statement (at least where the party had, or was chargeable with, full knowledge of the facts).[3] *Am.Jur.2d*, Estoppel, § 34. The doctrine prevents a party from getting a court (or courts) to issue conflicting rulings regarding the same parties and factual scenarios.

In Syllabus Point 2 of the case relied upon by the majority opinion, *W. Va. Dept. of Transportation v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506 (2005), the Court stated that judicial estoppel bars a party from re-litigating an *issue* by contradicting a previous *position.*[4]

The majority opinion in this case confused the terms *issue and positions:* the majority concluded that the terms mean *legal theories.* This is incorrect. The terms generally mean *factual declarations or factual statements.* The doctrine is usually applied when a party gets a favorable court ruling asserting one fact, and then tries to get another favorable ruling by asserting a contradicting fact.[5]

apparent inconsistency that is actually reconcilable; and
(5) the two positions must be totally inconsistent—that is, the truth of one position must necessarily preclude the truth of the other position, at least where the party had, or was chargeable with, full knowledge of the facts.

**4.** Syllabus Point 2 of *Robertson* states:

Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process.

**5.** For example: in *Robertson*, the landowner in an eminent domain proceeding claimed she owned 11.08 acres, and a court approved a settlement for $1.9 million for the cost of the land excluding coal underlying the property. Later, the landowner tried to settle the coal value by asserting her parcel of land contained 22.33

Rarely is the doctrine invoked to mean legal theories in the same case, because Rule 8(e)(2) of the *Rules of Civil Procedure* specifically allows competing legal positions.[6] The doctrine is designed to keep litigants from asserting one factual position that a court relies upon to the litigant's favor, and then asserting a conflicting factual position later that makes the court look foolish.

Furthermore, Rule 15 of the *Rules of Civil Procedure* allows a litigant to amend pleadings to conform the legal theories to the evidence introduced in the case.[7] So long as a jury's verdict is supported by the evidence, it doesn't matter what legal theory is eventually relied upon by the parties.

More importantly, it doesn't matter if a party didn't make a motion to amend a pleading under Rule 15. The general rule—by this Court and others—is that appellate courts will regard the pleadings as amended to conform to the proof even though the defaulting pleader made no formal motion to amend.[8]

acres. Because the landowner led the court to believe she only owned 11.08 acres, the integrity of the judicial process would be adversely affected by letting her rely upon an inconsistent factual position.

In *MacDonald v. Long*, 100 W.Va. 551, 131 S.E. 252 (1926), defendant Long signed a contract to buy a corporate grist mill but later refused to consumate the sale. The grist mill company later brought a chancery suit to dissolve the corporation and dispose of the company-owned mill. The chancery court appointed a special receiver. The special receiver sued the defendant for specific performance, to enforce the sale contract. The Court concluded that because the grist mill company had repudiated the sale contract in the chancery suit, the receiver could not subsequently take an inconsistent position and try and enforce the contract.

Bankruptcy courts generate quite a few judicial estoppel cases. In *Chandler v. Samford University*, 35 F.Supp.2d 861 (N.D.Ala.1999), an employee claimed in district court she was a victim of racial discrimination by her employer. The employee subsequently filed for bankruptcy, but never revealed the pending discrimination claim to the bankruptcy court. The bankruptcy was discharged favorably to the employee as a "no asset case." The district court dismissed the discrimination case because a debtor's assertion of a legal claim not disclosed in an earlier bankruptcy proceeding is the assumption of inconsistent positions, and is evidence of intent to manipulate the judicial system.

**6.** Rule 8(e)(2) of the *Rules of Civil Procedure* states:

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds or on both.

**7.** Rule 15(b) of the *Rules of Civil Procedure* states:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

**8.** The failure to amend a pleading "does not affect the result of the trial of these issues" has generally been interpreted, in West Virginia and nationwide, to mean that **appellate courts will deem the pleadings amended to conform to the evidence.** In Syllabus Point 4 of *Floyd v. Floyd*, 148 W.Va. 183, 133 S.E.2d 726 (1963), the Court said (with emphasis added):

Under both the old trial procedure in effect in West Virginia prior to July 1, 2960, and the new procedure in effect on and after that date as *Rules of Civil Procedure*, pleadings could be amended under control of the court during the trial of a case to encompass an issue raised by the evidence although not in the pleadings; but if an issue is so raised in trial and trial by consent of the parties without such amendment, **it is treated as if it had been raised in the pleadings and the failure to amend will not affect the verdict.**

*See also, City Bank of Wheeling v. Bryan*, 72 W.Va. 29, 78 S.E. 400 (1913) ("A variance between the allegation and proof, not called to the

Taken together, the plaintiff in this case did not assert conflicting facts with an intent to mislead the Court. The plaintiff did not prevail before the circuit judge by asserting one fact, but is now attempting to prevail by asserting a wholly conflicting alternate fact. Since the beginning of this case in 2001, the plaintiff has always asserted that her case against WVUH centered upon the hospital environment.[9] The facts presented to the jury concerned the hospital environment. WVUH has acknowledged, since as early as 2002, that it understood that the plaintiff's case centered on the hospital environment.

Under these conditions, judicial estoppel does not apply.

Instead, the parties freely presented their facts to the ultimate truth-finder, the jury. The jury concluded that WVUH had a duty of care to maintain a safe environment for the plaintiff, that WVUH breached that duty, and that the breach was a proximate cause of her damages. The precise nature of the plaintiffs' legal theories could be inconsistent under Rule 8, and under Rule 15 this Court can adopt whatever legal theory is supported by the facts. The plaintiffs' failure to amend

the pleadings to conform to the evidence is irrelevant; under Rule 15, "the failure so to amend does not affect the result of the trial of these issues."

But the majority's opinion tramples the *Rules of Civil Procedure*, and imposed an impossible burden upon the plaintiff. The majority opinion expects plaintiffs to file specific factual allegations in their complaint before conducting discovery, and to list all statutes that do not apply to their case.

And, in the end, a jury's verdict was ignored and justice was denied.

If there is any light to be found in the majority's opinion, it is in the fact that it did not actually address the parties' legal arguments. I suspect it was because the majority opinion could not do so without either issuing an opinion unfavorable to the hospital, or issuing an opinion that was more factually and legally wrong.

I dissent.

### DAVIS, Chief Justice, concurring.
(Filed Jan. 3, 2008)

I concur in the majority opinion's determination that the doctrine of judicial estoppel

---

attention of the lower court by any means, if not so great as to show distinct causes of suit, will be treated by this court as having been waived."). For additional authorities, *see, Carter v. Swift*, 236 Ga.App. 804, 513 S.E.2d 766 (1999) (Although accord and satisfaction was not pled as affirmative defense in action to recover on promissory note, the issue was tried by the parties, and, therefore, would be treated on appeal as if raised by the pleadings.); *Boers v. Payline Systems, Inc.*, 141 Or.App. 238, 918 P.2d 432 (1996) (When defect in pleading consists of omission of necessary fact that pleader could have added by amendment ... Court of Appeals will treat case as though question had been raised at proper time and pleadings amended accordingly.); *Auburn Harpswell Ass'n v. Day*, 438 A.2d 234 (Me., 1981) (Issues not raised by the pleadings but tried by express or implied consent are treated in all respects as if they had been raised in the pleadings. Rules Civ. Proc., Rule 15(b)); *Pickett v. First American Sav. & Loan Ass'n*, 90 Ill. App.3d 245, 45 Ill.Dec. 531, 412 N.E.2d 1113 (1980) (In interest of justice, courts of review will not ignore plaintiffs real claim so long as it is supported by evidence, even though it may not have been adequately pleaded); *Sorrells v. Bailey Cattle Co.*, 268 Ark. 800, 595 S.W.2d 950 (App., 1980) (In *de novo* review of equity case, Court of Appeals treated pleadings as amended to conform with proof); *PSL Realty Co. v Granite Inv.*

*Co.*, 76 Ill.App.3d 978, 32 Ill.Dec. 411, 395 N.E.2d 641 (1979) (Where issues regarding propriety of receiver's spending hundreds of thousands of dollars for capital improvements to apartment units, spending for renovation of units and propriety of receiver's purchasing mortgages covering units were presented to trial court, and issues were continued in Appellate Court in both briefs and oral argument, parties were deemed to have formed issues at trial, even absent formal pleadings); *Goldman v. Bloom*, 90 Wis.2d 466, 280 N.W.2d 170 (Wis., 1979) (Complaint will be treated as amended, even though no amendment has been requested, where the proof, varying from the pleadings, has been submitted and accepted.)

9. The case against Ms. Riggs' treating physician, Dr. Post, *was* one of medical negligence. Dr. Post was apparently negligent in allowing an infection to occur in the first place, and negligent in failing to diagnose and treat the infection in subsequent surgeries. This explains why many of the pleadings and other filings in the record freely use the phrase "medical malpractice." The plaintiff's attorneys concede that this case involved medical malpractice—but the medical malpractice component of the case was eliminated when Dr. Post's employer settled before trial.

This subtle nuance in the plaintiff's case was, of course, ignored by the majority opinion.

precluded the Appellants from changing their theory of liability after the jury returned its verdict. I have chosen to write separately to discuss the issue of whether or not the cause of action filed against WVUH *could have been* brought outside the MPLA,[1] and to respond to the flawed arguments of the dissents.

## A. The Appellants Should Have Asserted Prior to Trial That Their Cause of Action Against WVUH Was Not Governed by the MPLA.

The majority opinion has meticulously pointed out the following relevant facts: (1) Appellants pled their claim against WVUH under the MPLA; (2) Appellants argued during a pretrial conference that if they prevailed they would attempt to get around the MPLA's cap by asserting that WVUH was self-insured; (3) Appellants proffered a jury instruction based upon the MPLA; and (4) the trial judge instructed the jury to determine liability based upon the standards set out under the MPLA. It was only after the Appellants obtained a favorable jury verdict that they alleged their case was actually a pure negligence claim that was outside the scope of the MPLA. This tactical manipulation of the judicial system is precisely the reason for the creation of the judicial estoppel doctrine, *i.e.*, it is simply wrong to permit a party to mislead the court and the opposing party on a dispositive issue and, after prevailing on that issue, take a position that is in conflict with the dispositive issue upon which he/she prevailed.

1. I wish to make clear that the majority opinion did not address the question of whether or not the Appellants' cause of action had to actually be commenced and litigated under the MPLA. The majority opinion was narrowly focused upon the issue of whether or not the Appellants should be judicially estopped from asserting that the MPLA did not apply, even though they commenced and litigated their claim under the MPLA.

:

2. Even if the Appellants did not realize until after discovery was completed that their cause of action fell outside of the MPLA, they should have thereafter timely filed a motion to amend their complaint to state a non-MPLA cause of action against WVUH. Under either situation, as an original pleading or amended pleading, the circuit court would have been. given an opportunity prior to trial to decide whether the case would be

Even though I agree with the majority opinion that judicial estoppel prevented the Appellants from prevailing on the post-trial argument that their claim was not covered by the MPLA, I ultimately believe that the Appellants' claim was not covered by the MPLA. That is, I believe the Appellants should have pled their claim against WVUH as one that did not fall under the MPLA.[2]

It has been correctly observed that "[t]he fact that the alleged misconduct occurs in a healthcare facility does not, by itself, make the claim one for malpractice. Nor does the fact that the injured party was a patient at the facility or of the provider, create such a claim." *Madison Ctr., Inc. v. R.R.K.,* 853 N.E.2d 1286, 1288 (Ind.Ct.App.2006). *See also  Atlanta Women's Health Group v. Clemons,* 287 Ga.App. 426, 651 S.E.2d 762 (2007) ("Of course, not every suit which calls into question the conduct of one who happens to be a medical professional is a medical malpractice action. We must look to the substance of an action against a medical professional in determining whether the action is one for professional or simple negligence."); *Perkins v. Susan B. Allen Mem'l Hosp.,* 36 Kan.App.2d 885, 146 P.3d 1102, 1107 (2006) ("Not every claim for negligence against a healthcare provider constitutes malpractice."); *Draper v. Westerfield,* 181 S.W.3d 283, 290 (Tenn.2005) ("Cases involving health or medical entities do not automatically fall within the medical malpractice statute."). Thus, "when the complaint does not allege negligence in furnishing medical treatment to

presented to the jury as an MPLA claim or a cause of action brought outside the MPLA. After such a pretrial ruling the party adversely affected thereby could have challenged that ruling to this Court for a definitive decision as to whether or not the claim fell outside the scope of the MPLA. *See Blankenship v. Ethicon, Inc.,* 2007 WL 3034262, No. 33224, 221 W.Va. 700, 656 S.E.2d 451 (2007) (affirming pretrial decision by circuit court that claim for injuries resulting from use of contaminated sutures fell under MPLA); *Phillips v. Larry's Drive-In Pharmacy, Inc.,* 220 W.Va. 484, 647 S.E.2d 920 (2007) (answering pretrial certified question by indicating claim against pharmacy did not fall under MPLA); *Gray v. Mena,* 218 W.Va. 564, 625 S.E.2d 326 (2005) (holding that circuit court's pretrial ruling correctly found that claim for assault and battery came under MPLA).

a patient, but rather the failure of a medical provider in fulfilling a different duty, the claim sounds in negligence." *Rodriguez v. Saal*, 43 A.D.3d 272, 841 N.Y.S.2d 232, 235 (2007).

Pursuant to Code § 55–7B–2(i) (2006) (Supp.2007),[3] a cause of action for medical professional liability is defined as "any liability for damages resulting from the death or injury of a person for any tort or breach of contract *based on health care services rendered, or which should have been rendered*, by a health care provider or health care facility to a patient." (Emphasis added). The Legislature has defined health care services to "mean[ ] any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to or on behalf of a patient during the patient's medical care, treatment or confinement." W. Va.Code § 55–7B–2(e) (2006) (Supp.2007).[4] Applying the latter definitions to the facts of the instant case, it is clear to me that the Appellants* cause of action against WVUH fell outside the MPLA.

The facts in the instant case demonstrate that at the time Ms. Riggs was having knee surgery, WVUH exposed all of its patients, and possibly anyone entering the hospital, to the potential of contracting a serratia bacterial infection. The potential for contracting a serratia bacterial infection was not the reason Ms. Riggs was admitted to the hospital. Ms. Riggs sought medical treatment for her right knee. The duty breached by WVUH was not that of failing to properly treat Ms. Riggs' knee, WVUH breached a general duty it owed to all patients and nonpatients to maintain a safe environment. *See Padney v. MetroHealth Med. Ctr.*, 145 Ohio App.3d 759, 764 N.E.2d 492 (2001) (allowing estate of deceased hospital worker to bring common law tort actions against hospital on theory that hospital failed to employ adequate controls to prevent transmission of tuberculosis to its employees). Breach of the duty by a hospital to maintain a safe environment,

which breach causes injury to a patient or nonpatient, simply does not fall under the MPLA.

Courts around the country have formulated various tests to be used in deciding whether conduct by a health care provider must be litigated under medical malpractice statutes, or may be litigated as a claim for common law negligence or a premises liability tort The following are some examples of tests used by courts.

[I]n determining whether an action is for medical malpractice or for common law negligence, the issue is whether the alleged negligent conduct bears a substantial relationship to the rendition of medical treatment by a medical professional. If so, the medical malpractice statute applies. If, however, the plaintiff seeks compensation for injuries resulting from negligent conduct not affecting a patient's medical treatment, the claim falls under common law negligence.

*Draper v. Westerfield*, 181 S.W.3d 283, 290–91 (Tenn.2005) (internal quotations and citations omitted).

[T]he relevant considerations in determining whether a claim sounds in medical malpractice are whether (1) the defendants are sued in their capacities as medical professionals, (2) the alleged negligence is of a specialized medical nature that arises out of the medical professional-patient relationship and (3) the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment.

*Trimel v. Lawrence & Mem'l Hosp. Rehab. Ctr.*, 61 Conn.App. 353, 764 A.2d 203, 207 (2001).

[A] court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and

---

3. Although I quote from the current version of the statute, identical language may be found in the statutory version in effect at the time Ms. Riggs' suit was filed. *See* W. Va.Code § 55–7B–2(d) (1986) (Repl.Vol.2000).

4. *See supra* note 3. Language identical to that quoted may be found in the statutory version in effect at the time Ms. Riggs' suit was filed. *See* W. Va.Code § 55–7B–2(a) (1986) (Repl.Vol. 2000).

(2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions.

*Bryant v. Oakpointe Villa Nursing Ctr.,* 471 Mich. 411, 684 N.W.2d 864, 871 (2004).

(1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill,

(2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

(3) whether the pertinent act or omission involved assessment of the patient's condition,

(4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

(5) whether the injury would have occurred if the patient had not sought treatment, and

(6) whether the tort alleged was intentional.

*Blevins v. Hamilton Med. Ctr., Inc.,* 959 So.2d 440, 445 (La.2007). In my opinion, under any of the above tests, the allegations against WVUH would clearly fall outside the MPLA.

The specific issue of whether or not a disease contracted by a patient, while undergoing surgery, is governed by medical malpractice laws was addressed in *Methodist Hospital v. Ray,* 551 N.E.2d 463 (Ind.Ct.App. 1990), *aff'd,* 558 N.E.2d 829. In *Methodist Hospital,* the plaintiff was a patient at the defendant hospital. The plaintiff was at the hospital to have a kidney stone destroyed. During the plaintiff's treatment, the hospital became infected with a deadly bacteria commonly known as Legionnaire's Pneumonia Virus. The plaintiff sustained injuries from the virus. At the time of the injuries, Indiana had a medical malpractice statute which required all medical malpractice cases be initially filed with a medical review panel. However, because the plaintiff did not believe that his injuries came under the medical malpractice statute, he did not file a complaint with the medical review panel. Instead, the plaintiff filed a premises liability action against the hospital with a trial court. The hospital filed a motion to dismiss the action for failure to comply with the medical malpractice pre-suit requirements. The trial court denied the motion on the grounds that the injuries sustained by the plaintiff did not come under the medical malpractice statute. The hospital appealed. An appellate court agreed with the trial court, ruling as follows:

> The dispositive issues whether or not the allegations of Ray's complaint sound in ordinary negligence for premises liability or whether they assert a failure to provide the type of care that would bring the claim within the Medical Malpractice Act and thus require dismissal for lack of subject-matter jurisdiction. This framing of the issue, of course, rests upon the assumption that if a complaint sounds in ordinary negligence it does not fall within the purview of the Medical Malpractice Act.
>
> . . .
>
> In relation to our decision we deem it appropriate to address an issue presented during oral argument. During that proceeding, Methodist suggested [we] . . . interpret our Medical Malpractice Act as all-inclusive. That is, that the mere allegation of a patient-provider relationship is enough to bring a case within the Act and therefore trigger the need for plaintiff to come forward with facts which would remove the complaint from the scope of the Act. Because Ray's complaint alleges a patient-provider relationship and no supporting affidavits were filed in response to the Motion to Dismiss, Methodist asserts that the trial court was required to dismiss the complaint. In support of its argument, Defendant cited to [a prior case wherein it was said]:
>
> > "Those seeking to avoid coverage under the Act travel a rocky road. The framers of the Act used *broad* language."
>
> While it is true that plaintiffs such as Ray may be required to traverse a difficult path, we decline Methodist's invitation to make the road totally impassable. There

is no support for Methodist's interpretation of the Act. Caselaw in Indiana and other jurisdictions consistently acknowledge that certain patient-provider cases fall outside the scope of medical malpractice. . . .

. . . .

Premises liability, however, derives from the common law. Our Medical Malpractice Act provides that:

"No action against a health care provider may be commenced in any court of this State before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this chapter and an opinion is rendered by the panel.". . . .

As such, it is in derogation of the common law and must be strictly construed. . . .

. . . .

To extend the reach of the Act beyond its intended scope would necessarily involve extending the scope of our function as a judicial body. Until the legislature says otherwise we cannot hold, as a matter of law, that the Act covers every patient-provider case. . . .

Because we cannot say, as a matter of law, that the case before us comes within the scope of Indiana's malpractice act, we hold that the trial court did not err in denying Methodist's motion to dismiss

*Methodist Hosp.*, 551 N.E.2d at 465–69 (internal quotations and citations omitted). *But see Cashio v. Baton Rouge Gen. Hosp.*, 378 So.2d 182 (La.Ct.App.1979) (concluding that injury caused by hospital's failure to provide sterile environment fell under that state's Medical Malpractice Act).

The decision in *Methodist Hospital* is instructive of two things. First, contracting a disease while in a hospital, due to the hospital's failure to maintain a sterile environment, is simply not within the purview of medical malpractice statutes. Second, and most importantly to the instant case, *Methodist Hospital* demonstrates that the proper time for raising and determining the issue of whether a claim falls under medical malpractice statutes is prior to trial on the merits, not through a belated post-verdict assertion.

## B. Rule 15(b) Was Not Raised Nor Did it Have Any Application to the Appellants' Case.

Both dissenting opinions contend that Rule 15(b) should have been invoked to salvage the Appellants' verdict In the first paragraph of Justice Albright's dissent, he argues that the majority opinion "both obscured and ignored the importance of Rule 15(b) of the West Virginia Rules of Civil Procedure in our jurisdiction." In the second paragraph of Justice Albright's dissent, he stated that "[w]hile Appellants did not rely on Rule 15(b), they could have relied upon it to make their arguments post-verdict[.]" Justice Starcher argued that "it doesn't matter if a party didn't make a motion to amend a pleading under Rule 15." In essence, the dissenters concede that the Appellants failed to argue Rule 15(b) before the trial court and in their brief to this Court. The dissents take the position that, even though Rule 15(b) was never asserted by the Appellants, this Court should have sua sponte invoked the rule. Further, and without any analysis, the dissenters conclude that under Rule 15(b) the Appellants would have been permitted to amend their pleading to take their case out from under the MPLA. As I will demonstrate below, the argument of the dissenters is grounded on improper judicial activism and would lead to the emasculation of the intent and purpose of Rule 15(b). *See Matter of Estate of Pirie*, 141 Ill.App.3d 750, 97 Ill.Dec. 225, 492 N.E.2d 884, 898 (1986) ("Nor do we think this court should on its own motion order the amendment of plaintiffs' complaint to conform to the proofs. While plaintiffs may be able to recast their complaint to support a judgment in their favor based upon the facts as they exist in the record, a jury would not be required to return such a verdict, and thus, any new theory should be considered by a new jury. Moreover, any verdict returned by a jury in favor of plaintiffs based upon a new theory in an amended complaint likely would result in a different damage award. For these reasons, amendment of plaintiffs' complaint in this court would be inappropriate.").

**1. An issue not raised on appeal is deemed waived.** The dissenters attempt to

lay blame on the majority opinion for not addressing the pleading amendment procedure under Rule 15(b). The dissenters do not understand how Rule 15(b) operates.

To begin, the text of Rule 15(b) provides as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Under this rule there are two ways in which an amendment may occur. The two methods were discussed in *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275 (10th Cir.2004), as follows:

> Rule 15(b) contains two mechanisms for amending the complaint to conform to the evidence. First, a complaint may be impliedly amended under Rule 15(b) if an issue has been tried with the express or implied consent of the parties and not over objection. A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence. However, implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that

the party presenting the evidence intended to raise a new issue.

> This mechanism for implying an amendment is not available if the opposing party objects to evidence pertaining to a new claim. Instead, upon objection by the opposing party, the party wishing to amend the pleadings must employ the second mechanism of Rule 15(b). Pursuant to that mechanism, the pleadings may be amended if the party files a motion to amend the complaint and the objecting party fails to satisfy the court that it will be prejudiced by the amendment. The party must expressly move under Rule 15(b) for such an amendment.

*Green Country*, 371 F.3d at 1280–81 (internal quotations and citations omitted).[5]

The decision in *Green Country* teaches that where the parties impliedly or expressly consent to litigate an issue not raised in the pleadings, it is not necessary for a formal motion to be filed to amend the pleading to reflect the new issue. *See* Syl. pt. 4, in part, *Floyd v. Floyd*, 148 W.Va. 183, 133 S.E.2d 726 (1963) ("[I]f an issue [that was not pled in a complaint] is so raised in trial and trial by consent of the parties without such amendment, it is treated as if it had been raised in the pleadings and the failure to amend will not affect the verdict."). However, when a party has objected to an issue being part of the case, it is *mandatory* that a motion to amend be filed under Rule 15(b), and a favorable ruling given for the moving party, before the issue becomes part of the litigation.

The dissenters have omitted any discussion of the two ways in which an amendment to the pleadings may occur under Rule 15(b). The dissenters have, in essence, incorrectly argued that under no circumstance is it necessary for a party to file a motion under Rule 15(b) in order to interject a new issue into the litigation. This is simply wrong. Further, and in spite of Justice Starcher's legally unsupported argument to the contrary, no decision of this Court has ever held that Rule 15(b) never requires a motion to be filed

---

**5.** The federal Rule 15(b) was amended in 2007 to provide for mere stylistic changes. However, prior to the amendment the federal rule was identical to West Virginia's Rule 15(b).

before it may relied upon to amend a pleading to interject a new issue.

In the instant proceeding the record is crystal clear in showing that WVUH objected to any attempt by the Appellants to litigate the case outside the MPLA. This objection, as brought out in the majority opinion, came in the context of stipulations made by the parties prior to trial. After the stipulations were made, WVUH forwarded a letter to the trial judge, wherein it was said that "WVUH, Inc. will object ... to any attempt by plaintiffs' counsel to use the stipulations concerning Dr. Khakoo and Bonny McTaggart to argue plaintiffs' case against WVUH is or was anything other than a medical professional liability [cause] of action." As a result of this letter, the Appellants had to file a motion under Rule 15(b) in order to attempt to amend the complaint to take the cause of action outside the MPLA.

The Appellants did not make either an oral or a written motion to the trial court to amend their pleading under Rule 15(b). *See Hanlon v. Logan County Bd. of Educ.*, 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997) ("Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur in order to preserve the alleged error for appeal."); Syl. pt. 6 *Dunning v. Barlow & Wisler Inc.*, 148 W.Va. 206, 133 S.E.2d 784 (1963) ("In cases within its appellate jurisdiction this Court will not consider or decide nonjurisdictional questions which have not been determined by the trial court"). Further, as previously indicated, the Appellants did not ask this Court to consider Rule 15(b) as a basis for granting the relief they sought. Our case law is quite firm in holding that "[i]ssues not raised on appeal ... are deemed waived." *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998). *See also Canterbury v. Laird*, 221 W.Va. 453, 457 n. 9, 655 S.E.2d 199, 203 n. 9 (2007) ("Mr. Canterbury failed to raise or argue any issue in his brief pertaining to summary judgment on his conspiracy liability theories, we deem the matters to be waived."); *In re Edward B.*, 210 W.Va. 621, 625 n. 2, 558 S.E.2d 620, 624 n. 2 (2001)

("Because the errors ... were neither assigned nor argued in the Appellant's brief, they are hereby waived."); Syl. pt. 6, *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived."). Thus, to the extent that Rule 15(b) had any application to this case, the Appellants' failure to raise the matter resulted in a waiver. *See Northwood Stone & Asphalt, Inc. v. Occupational Safety & Health Review Comm'n*, No. 94–4327, 1996 WL 160821, at *5 (6th Cir. 1996) ("Rule 15(b) permits a court to amend the pleadings upon motion by a party. We have found no case permitting a court to amend the pleadings *sua sponte* ").

**2. Rule 15(b) was not applicable to this case.** The dissenters argued that Rule 15(b) applied to this case and that the rule would have allowed the Appellants to remove their case from under the MPLA. Although the dissents made this argument, they totally failed to perform any analysis of Rule 15(b) to determine whether the facts of this case satisfied the rule's criteria. As I will demonstrate, the Appellants did not raise the issue of Rule 15(b) at trial nor on appeal because they clearly understood that they could not satisfy the rule's requirements.

" 'Rule 15(b) provides that when issues not raised by the pleadings are tried by express or implied consent of the parties, such issues must be treated in all respects as if they had been raised in the pleadings.' " *State ex rel. Packard v. Perry*, 221 W.Va. 526, 533 n. 9, 655 S.E.2d 548, 555 n. 9 (2007) (quoting Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 15(b)[1], p. 460 (2d ed.2006)). In Syllabus, point 1 of *Miller v. City of Morgantown*, 158 W.Va. 104, 208 S.E.2d 780 (1974), we held the following regarding Rule 15(b):

> Where it is clear from the record that issues not raised by the pleadings were not tried by the express or implied consent of the parties, they cannot be treated as if they had been raised in the pleadings under the provisions of Rule 15(b).

The decision in *Miller* illustrates the application of Rule 15(b) when a party attempts to

change his/her theory of the case after a jury verdict. In *Miller*, the City of Morgantown was sued by Mr. and Mrs. Miller as a result of injuries received by Mrs. Miller when she slipped and fell on a sidewalk.[6] The complaint set out a cause of action for strict liability, and the case was tried on that theory. The jury returned a verdict in favor of the Millers. The City appealed.

In the appeal the City contended that a prior statute imposed strict liability upon municipalities for injuries caused to anyone falling on a sidewalk. However, at the time the Millers' action arose, the statute had been amended and required liability be shown through negligence on the part of a municipality. This Court agreed with the City that a negligence standard of liability had been imposed by the amended statute. Nevertheless, the Millers argued that "even though negligence was not relied on in the complaint for recovery against the City for the injury suffered as a result of the defective sidewalk, this issue was tried by the implied consent of the parties under Rule 15(b)." *Miller*, 158 W.Va. at 107, 208 S.E.2d at 783. Based upon the evidence in the record, this Court rejected the Millers' argument as follows:

> This position is not well taken because it is abundantly clear from the record that neither the plaintiffs nor the defendant City thought the case was tried on the theory of negligence against the City. There was no express or implied consent by either party. The attorney for the plaintiff stated unequivocally in his opening statement that he was trying the case on the basis of absolute liability against the City and at the conclusion of the plaintiffs' evidence he reiterated that he was trying it on such basis. The attorney for the City moved for a directed verdict because the case was not pleaded or tried on the proper theory against the City. The complaint alleged absolute liability on the part of the City and the City in its answer asked to have the case dismissed because of the pleading against it. The motion for a directed verdict was made immediately after the attorney for the plaintiffs stated that he was trying the case under the theory of absolute liability against the City. Apparently this situation came about by virtue of a misapprehension on the part of the attorney for the plaintiffs relative to the statute having been amended in 1969. Under these facts there could be no express or implied consent to try this case on the issue of negligence which was not raised in the pleading and no attempt was made at any time to amend the pleading.

*Miller*, 158 W.Va. at 108, 208 S.E.2d at 783.

Assuming, for the sake of argument, that the Appellants in the instant case had raised the issue of Rule 15(b), under *Miller* they would not have prevailed. The majority opinion has ably demonstrated that this case was pled under the MPLA, tried under the MPLA, and the jury was instructed to make its finding based upon the law applicable to the MPLA. In other words, there was not a scintilla of evidence to show that the parties expressly or impliedly consented to litigate this case on any theory other than a statutory medical negligence cause of action. Consequently, the Appellants could not have prevailed on the Rule 15(b) issue that was raised sua sponte by the dissenters. Indeed, if this Court followed the dissenters' tortured interpretation of Rule 15(b), "a losing party, by motions to amend and rehear, could keep a case in court indefinitely, trying one theory of recovery or defense after another, in the hope of finally hitting upon a successful one. Courts draw a dividing line between this use of amendment and those uses aimed at conformity." *Hart v. Knox County*, 79 F.Supp. 654, 658 (E.D.Tenn.1948). *See also Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir.1981) (" 'The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore, an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, even though there is evidence in the record intro-

---

**6.** There were other defendants in the case, but the issues involving them are not relevant to this discussion.

duced as relevant to some other issue which would support the amendment.'" (quoting *Gallon v. Lloyd–Thomas Co.*, 264 F.2d 821, 825 n. 3 (8th Cir.1959))); *Cleary v. Indiana Beach, Inc.*, 275 F.2d 543, 546–47 (7th Cir. 1960) ("The complaint sounded on negligence. The case was tried, submitted to the jury, and, by the jury considered on the theory of negligence. After the verdict, plaintiff filed a motion, assertedly on authority of [Rule 15(b)], to amend his complaint to allege that defendant had been guilty of wilful and wanton misconduct If Rule 15(b) were applied in the manner in which it is here sought to be used, litigation might never end. We think it obvious that the Rule was not intended to permit a party to amend his pleadings after verdict and, thereby upset the verdict by asserting a new theory which was not included in the original pleadings, and upon which the case was not tried."); *Wilmot v. Racine County*, 128 Wis.2d 138, 382 N.W.2d 442, 447 (Ct.App.1985), *rev'd on other grounds*, 136 Wis.2d 57, 400 N.W.2d 917 (Wis.1987) ("This case was tried on the theory of negligence, not agency liability.... Once the case was tried and submitted to the jury on a theory of negligence, it would have been improper for the trial court to decide the case on a theory of respondeat superior, especially since agency was neither argued to the jury nor included in the instructions.").

### C. Justice Starcher's Dissent

In addition to the Rule 15(b) issue, Justice Starcher's dissent postures two other flawed arguments in an attempt to undermine the well-reasoned and legally sound majority opinion. I will address each of his unsound meanderings separately.

**1. The dissent has tortured the facts to reach an unsupported conclusion.** It is ironic, though not surprising, that Justice Starcher argues that the majority "opinion is one of the most factually misleading ... cases to be produced by this Court." The irony here, of course, is that Justice Starcher's dissent has embarked on a journey of cut and paste voodoo that has cast the record of this case in a light that even the Appellants would not recognize. In fact, if the record had spoken in the voice that Justice Starcher has mystically given it, my commitment to

fairness would have compelled me to vote differently in this case. Suffice to say, Justice Starcher's dissenting "opinion is one of the most factually misleading ... [opinions] to be produced by [him]."

To understand the smoke and mirrors argument made by Justice Starcher, one need merely reflect on the facts which he failed to address. The following matters, which are set out in the majority opinion, were not attacked by Justice Starcher as being inaccurate or created out of thin air by the majority:

(I) The Complaint asserted that the alleged damages were caused "as a direct and proximate result of the negligent failure of the Defendants to exercise the proper degree of skill, care and learning required of reasonably prudent healthcare providers."

(ii) After the Appellants settled their case against the Board of Governors and entered into a few stipulations with WVUH, a letter was written to the trial judge by WVUH wherein it was said that, "WVUH, Inc. will object ... to any attempt by plaintiffs' counsel to use the stipulations concerning Dr. Khakoo and Bonny McTaggart to argue plaintiffs' case against WVUH is or was anything other than a medical professional liability [cause] of action."

(iii) Appellants summarized their allegations in their pre-trial memorandum as follows: "As a direct and proximate result of the negligent failure of the Defendants to exercise the proper degree of skill, care and learning required of reasonable prudent healthcare providers, Plaintiff, Allison J. Riggs, was required to incur medical bills and suffer agonizing physical pain and suffering, mental anguish and anxiety and permanent physical injury. As a direct and proximate result of the negligent failure of the defendants to exercise the proper degree of skill, care and learning required of reasonable prudent healthcare providers, Plaintiff, Jack E. Riggs, incurred expenses and costs which were unnecessary and burdensome."

(iv) In their supplemental discovery disclosures the Appellants stated that Grant

O. Westenfelder, M.D., FACP ("Dr. Westenfelder"), would be their expert "in this medical professional negligence case." The Appellants stated that Dr. Westenfelder would "testify to a reasonable degree of medical probability" that WVUH "deviated from the standard of care" by failing to adequately inform and warn physicians, staff and patients regarding an "ongoing endemic/epidemic Serratia problem" In a subsequent supplemental disclosure the Appellants admitted that "[t]his medical malpractice action arises out of an intra-operative infection[.]" It was further stated that each expert was expected to testify "to a reasonable degree of medical probability" that WVUH "deviated from the standard of care" in (1) determining the source of serratia infections; (2) investigating, remediating and monitoring a serratia epidemic "which proximately resulted in Ms. Allison Riggs' contracting a nosocomial serratia infection"; (3) "failing to implement appropriate standards to locate, identify, isolate and remediate a nosocomial serratia epidemic"; and/or (4) "failing to take appropriate affirmative actions to locate, identify, isolate and remediate a nosocomial serratia epidemic[.]"

(v) During voir dire, Appellants informed the jurors that their injuries and damages were "a result of the hospital failing to meet the applicable standard of care in monitoring the infectious disease control procedures within the hospital and perhaps in some other ways that they were guilty of medical negligence[.]"

(vi) The Appellants requested that the jury be instructed regarding the legislative purpose behind the MPLA and the elements of a MPLA claim both by their proposed jury instructions and during arguments regarding the trial court's proposed jury charge. In their discussions with the trial court, regarding the jury instructions, Appellants acknowledged that they "tried to state the statutory burden of proof verbatim" in their proposed instructions. After reviewing the trial court's proposed instruction, Appellants' counsel stated "I think that's an accurate statement of medical malpractice or negligence,

degree of care, skill and learning ... I like it."

(vii) During the discussion by Appellants on their proposed instruction involving legislative findings regarding an insurance crisis in this State and the need for the MPLA, Appellants' counsel stated "let's say by some chance we win and we have all these caps that come in to reduce the verdict. If that happens, this hospital is self-insured so all those caps for the benefit of an insurance crisis I'm going to argue are inapplicable to a self-contained limit."

(viii) The trial court, without objections, instructed the jury under the law applicable to medical malpractice. The trial court did not give "any" instruction on premises liability or a pure negligence theory of liability.

Justice Starcher's dissent avoids any direct confrontation with the above facts. Instead, his dissent patches together a few inconsequential statements, taken totally out of context, in order to try and show that the case was intended to be tried as a non-medical malpractice case. The surrealistic characterization of the record by Justice Starcher invokes the saying, " '[o ], *what a tangled web we weave, [w ]hen first we practice to deceive !*' " *McGraw v. Imperial Mktg.,* 196 W.Va. 346, 359 n. 41, 472 S.E.2d 792, 805 n. 41 (1996) (quoting Sir Walter Scott, Marmion, Poetical Works 89, 161 (J. Logie Robertson ed.1967)). Clearly the above undisputed facts reveal to everyone, except Justice Starcher, that all the parties and the trial judge understood that the case was being prosecuted under the MPLA.

**2. Judicial estoppel was properly applied.** In Justice Starcher's dissent he argues that "[r]arely is the doctrine [of judicial estoppel] invoked to mean legal theories in the same case, because Rule 8(e)(2) of the Rules of Civil Procedure specifically allows competing legal positions." I do not disagree with Justice Starcher that it is rare for judicial estoppel to be applied to prevent a party from changing legal theories. I also do not disagree that Rule 8(e)(2) permits alternative theories to be pled. We pointed out in *West Virginia Department of Transportation, Di-*

*vision of Highways v. Robertson*, that "[t]he doctrine of judicial estoppel does not conflict with Rule 8(e)(2), which permits a party to plead inconsistent theories, because judicial estoppel does not bar a party from contradicting itself, the doctrine bars contradicting a court's determination that was based on that party's position." 217 W.Va. 497, 504 n. 18, 618 S.E.2d 506, 513 n. 18 (2005) (quoting Cleckley, Davis, & Palmer, *Litigation Handbook* § 3(f) (Supp.2005)).

I part company with Justice Starcher's dissent on the issue of the Appellants' obtaining a verdict on a theory of medical malpractice, and then attempting to change legal theories to obtain a verdict they would otherwise not be entitled to receive. Rule 8(e)(2) was not designed to support this type of manipulative tactic. Under this rule, a party may set out alternative legal theories in a pleading and, if the evidence supports the same, have a jury instructed on all of the alternative legal theories. *See Sydenstricker v. Mohan*, 217 W.Va. 552, 563, 618 S.E.2d 561, 572 (2005) (holding that doctrine of judicial estoppel could not be applied to prevent a party from pleading alternative defenses because Rule 8(e)(2) permitted this). However, Rule 8(e)(2) does not sanction sandbagging a party by asserting a post-trial legal theory of recovery that was never raised in the pleadings, nor expressly or impliedly consented to by the parties. This situation is an affront to the integrity of the judicial process, not just the adversely affected party. Consequently, it is appropriate to reaffirm the integrity of the court by applying the doctrine of judicial estoppel to such conduct. *See Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir.1997) ("[J]udicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion. The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal.").

It has been correctly observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation of principle." *Barringer v. Baptist Healthcare of Okla-*

*homa*, 22 P.3d 695, 699 (Okla.2001). Even so, it is generally recognized that "[s]ince judicial estoppel precludes parties from misrepresenting the facts in order to gain an unfair advantage, once 'a party has formally asserted a certain version of the facts in litigation, he cannot later change those facts when the initial version no longer suits him.'" *Carrigg v. Cannon*, 347 S.C. 75, 552 S.E.2d 767, 771 (Ct.App.2001) (quoting *Hayne Fed. Credit Union v. Bailey*, 327 S.C. 242, 489 S.E.2d 472, 477 (1997)). The doctrine was "intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.1992). In other words,

> Judicial estoppel is intended to protect the courts from the litigatory shenanigans that would result if parties could, without limitation or consequence, swap litigation positions like hats in successive cases based on simple expediency or self-benefit Judicial estoppel shields the courts from being the instrument of such misconduct.

*Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 915 (C.A.7, 2005). Indeed, "[t]he basic principle of judicial estoppel ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3rd Cir.1996). *See also New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (" '[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" (quoting 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4477, p. 782 (1981))); *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 198 (4th Cir.1998) ("To allow [plaintiff] to obtain benefits from two sources based on two incompatible positions, simply because the positions aid her claims for remuneration, would reduce truth to a mere financial convenience and would undermine the integrity of the judicial process. In the factual circumstances of this case, we conclude that the

district court was well within its discretion in applying judicial estoppel to preclude [plaintiff] from asserting a necessary element of her West Virginia age discrimination case").

A case that illustrates the application of the doctrine of judicial estoppel to prevent a party from changing his/her legal theory is *Van Deurzen v. Yamaha Motor Corp.*, 276 Wis.2d 815, 688 N.W.2d 777 (Ct.App.2004). In that case the plaintiff brought an action against the defendants after a jet ski accident that resulted in the amputation of one of the plaintiffs arms.[7] On the day of trial the plaintiff argued that the case should be litigated under maritime law, and not the substantive laws of Wisconsin. The plaintiff was successful in convincing the trial court that the accident occurred on navigable waters and that maritime law should therefore apply. The defendants moved to dismiss the case on the grounds that the statute of limitations had run under maritime law. The trial court deferred ruling on the motion until after the jury verdict. A jury ultimately returned a verdict under maritime law that was favorable to the plaintiff. However, the verdict was set aside and the case dismissed after the trial court issued a ruling finding the maritime law statute of limitations had run on the claims. The plaintiff appealed on the grounds that maritime law did not apply to the case. The appellate court rejected the argument on the grounds that the doctrine of judicial estoppel prevented the plaintiff from changing his legal theory:

> This case presents a textbook example of judicial estoppel.... The [plaintiff] went to great lengths to persuade the court that Little Lake Butte des Morts was a navigable waterway....
>
> ....
>
> We hold that judicial estoppel precludes the [plaintiff] from asserting that maritime law was inapplicable to [his] case. When we invoke this doctrine, we determine independently the elements and the considerations involved.... Judicial estoppel has three identifiable boundaries: (1) the party's position is clearly inconsistent with his or her prior position; (2) the party to be estopped succeeded below in selling its position to the

court; and (3) the facts at issue are the same.... The [plaintiff's] contention that maritime law is inapplicable because Little Lake Butte des Morts is not navigable clearly contradicts [his] position at trial that maritime law applied because the accident occurred on navigable waters. Moreover, this earlier position succeeded at trial.

> ....
>
> We conclude that the trial court's finding that Little Lake Butte des Morts was a navigable waterway constitutes a final historical fact which may not be revisited. Consequently, its application of maritime law was proper Thus, the doctrine of judicial estoppel applies.

*Van Deurzen*, 688 N.W.2d at 778–82. *See also Tangwall v. Looby*, 109 Fed.Appx. 12, 15 (6th Cir.2004) ("[Plaintiff] cannot now assert a contradictory legal theory to prolong this litigation and extract more funds from the defendants personally or from the BFPT. The doctrine of judicial estoppel is designed to forestall precisely this kind of ploy.").

The decision in *Van Deurzen* is consistent with the majority opinion in the instant case. In *Van Deurzen* the plaintiff litigated his case under maritime law. The defendants' defense in the case was based upon maritime law. The trial court instructed the jury to return a verdict based upon principles of maritime law. In the instant proceeding the Appellants litigated their case under the MPLA. The case was defended by WVUH based upon the MPLA. The trial court instructed the jury to return a verdict based upon principles of the MPLA. In *Van Deurzen* the jury returned a verdict in favor of the plaintiff. However, as a result of an adverse post-trial ruling, the plaintiff sought to change legal theories by arguing that maritime law did not apply to his case. In the instant matter the jury returned a verdict in favor of the Appellants. However, as a result of an adverse post-trial ruling, the Appellants sought to change legal theories by arguing that the MPLA did not apply to their case. The appellate court in *Van Deurzen* held that the doctrine of judicial estoppel precluded the plaintiff from changing his the-

---

7. There were two other plaintiffs in the case.

ory of the case. In the instant proceeding the majority also held that the doctrine of judicial estoppel precluded the Appellants from changing their theory of the case.

To summarize, the majority correctly determined that the Appellants are judicially estopped from claiming that the MPLA does not apply to their claim when the Appellants had earlier relied upon the MPLA to prosecute their case and obtain a favorable jury verdict. Because the opinion issued by the majority provides a well-reasoned discussion of the doctrine of judicial estoppel and correctly applies it to the facts of this case, I concur.